**ENGELHARD INDUSTRIES, INC.,**
Appellant,

v.

**RESEARCH INSTRUMENTAL CORPO-
RATION, Appellee.**

No. 17848.

United States Court of Appeals
Ninth Circuit.

Oct. 28, 1963.

Rehearing Denied Dec. 23, 1963.

**348**

James E. Bryan, Washington, D. C., and Elliott & Pastoriza, and William J. Elliott, Santa Monica, Cal., for appellant.

Kendrick & Stolzy, and Elwood S. Kendrick, Los Angeles, Cal., for appellees.

Before HAMLEY and KOELSCH, Circuit Judges, and MacBRIDE, District Judge.

KOELSCH, Circuit Judge.

By its complaint, Engelhard Industries, Inc. (Engelhard) charged Research Instrumental Corp. (Research) with infringement of U. S. Letters Patent No. 2,805,191, and with unfair competition. The patent was issued on September 3, 1957 to Engelhard's assignor Hersch and is entitled "Oxygen Analysis of Gases." In the complaint Engelhard alleged that Research had infringed "the patent" by manufacturing and selling oxygen analyzers that embodied the invention of the patent; Engelhard further alleged that Research had unfairly competed by misappropriating, prior to the date the patent issued, confidential information relative to a working model of its analyzer.

After extensive discovery proceedings, Research moved for summary judgment in its favor. In a supporting memorandum it advanced the following reasons why summary judgment should be entered: The patent is invalid, file wrapper

estoppel, the patent is not infringed, and the acts of Research do not constitute unfair competition. As to all of these grounds, Research asserted that there was no genuine issue as to any material fact.

Resisting the motion Engelhard filed two affidavits, together with a statement purporting to list genuine issues of material fact. The trial court opined (D.C., 196 F.Supp. 138) that Research was not guilty of either infringement or unfair competition and accordingly did not pass on the question of validity.

Engelhard then sought a rehearing. The petition was denied and judgment was entered against Engelhard, who appealed to this court.

The Hersch patent defines a method and an apparatus for detecting electrochemically the presence of oxygen, particularly minute or trace quantities, in other gases. The apparatus includes in combination the constituent elements of the ordinary automobile storage battery or galvanic cell—that is, a container or case, two electrodes (one a negative pole or cathode, and the other a positive pole or anode), and a liquid electrolyte.[1] It operates on the well-known principle that oxygen coming into contact with the cathode and the liquid electrolyte in a galvanic cell sets up a chemical reaction which causes the production of ions; the ions flow toward the anode to produce an electric current. This current varies with the rate of absorption of the oxygen into the cell, which in turn is a function of the amount of oxygen coming into contact with the cathode. The current can be registered by a galvanometer or other measuring device.

The alleged novelty of the Hersch patent lies in the cathode. In the first of two embodiments of the invention depicted in the patent the cathode appears as a solid piece of metal; it is so suspended that a portion rests in the pool or reservoir of electrolyte in the cell. In the second embodiment the cathode is tubular and composed of metal gauze; it is positioned above the reservoir but encircles a wick that extends into the liquid.

The cathode of the accused analyzer is composed of eight pieces of fine wire screen folded in half. These double screen sections are partially immersed in the reservoir. And due to their construction the electrolyte, by means of capillary action, creeps up between the folds.

The claims in the Hersch patent are broad enough to cover a cathode composed of screen, for their only limitation is that the cathode must be of "imporous metal." And the statement in the patent specifications that "the cathode may take the form of a solid metal element such as sheet, wire, etc., or it may be in the form of gauze, the elements of which are solid strands," would seem to expressly show the patent monopoly extends to the use of screen.

Nevertheless, the district court, believing the doctrine of file wrapper estoppel applicable, held that Engelhard could not assert that its patent covered the screen cathode used in the accused analyzer.[2]

1. Claim 12, representative of the apparatus claims, reads in pertinent part as follows: "An apparatus * * * comprising, in combination, a container having inlet and outlet means to accommodate the continuous flow of a stream of gas containing uncombined oxygen, a cathode of imporous precious metal having an area free of an aqueous electrolyte and having an area partially submerged in said aqueous electrolyte maintained substantially stagnant thereon, said free area and said partially submerged area being exposed to said stream of gas whereby a three-phase boundary is formed when said stream of gas is passed through the apparatus, * * * a base metal anode * * * in contact with said aqueous electrolyte * * * [and] an external electrical connection other than said electrolyte completing a circuit between said anode and said cathode * * *."

2. It is well settled that "[w]hen a patentee, on the rejection of his application, inserts in his specification, in consequence, limitations and restrictions for the purpose of obtaining his patent, he cannot, after he has obtained it, claim that it shall be construed as it would have been construed if such limitations and restrictions were not contained in it."

Its holding was based on the notion that Engelhard represented that his invention consisted of a method and apparatus in which electrolyte did not rise above the level of the reservoir and onto the unimmersed portion of the cathode.

We are unable to agree. It appears that when the patent application was filed the patent examiner rejected claims on several grounds, one being that they did not define over the prior art, particularly the patent granted to one Haller, (U. S. Letters Patent No. 2,651,612). He tentatively determined that no generic claim was allowable, that each of the two embodiments of the invention appearing in the drawings constituted a separate specie of an oxygen analyzer; and he required Hersch to elect between claims specific to one or the other of those species.[3]

In response, Hersch amended his application. He revised some of the claims to meet the examiner's general objections; he retained his generic claims, as he was permitted to do, and he expressly elected to prosecute the specie exemplified by the wire gauze cathode, selecting accordingly certain of the claims which he believed read on the elected specie. However, the examiner ruled that, since the latter claims as then worded spoke of the cathode as "imporous," they described the first rather than the second specie because "wire gauze * * * [is considered] porous in the broad sense."

If at this stage of the application Hersch had acquiesced in the examiner's definition of the phrase "imporous cathode" and if he had continued to employ that phrase in subsequent amendments of his application he would, in effect, have withdrawn his election of the second specie and substituted for it an election of the first; and any generic claims would have been likewise limited to a method and apparatus employing an imporous cathode as opposed to one of screen or gauze. Roemer v. Peddie, 132 U.S. 313, 10 S.Ct. 98, 33 L.Ed. 382 (1889).

But Hersch did not let the matter lie. Following the examiner's ruling Hersch again amended his application. In an effort to conform his claims to the elected specie he replaced all of the old claims with new ones. The old claims had called for an "imporous cathode" but the new ones, both specific and generic, referred to and described it as a "cathode of imporous metal." After the language had been thus broadened, the examiner made no further objection that the claims did not comport with the election; he

Roemer v. Peddie, 132 U.S. 313, 317, 10 S.Ct. 98, 99, 33 L.Ed. 382 (1889).

3. A patent may stand at the head of its genus or it may stand only at the head of a species of its genus. If the invention is of the former type a generic claim as well as claims directed to a number of species under the genus may all be included in one patent. But if the genus appears in the prior art, only the species claims may be patentable, and since two or more independent inventions cannot be claimed in one application, the applicant must elect that species to which his claims shall be restricted.

"It is a proper practice to make a generic claim and also a specific claim, in an application for a patent on a generic invention, even where only one species is described in the specification. * * *

"In such a case, if the inventor's understanding that his invention is primary, turns out to be true, both claims will be valid. But if some invention is afterward discovered in the prior art, which relegates the patent to a secondary place, the specific claim may stand and be valid, though the generic claim is too broad to be maintained." Walker Patents 780 (Deller edition 1937); see generally id. at 1277.

The procedure followed by the examiner in determining that an election of species was required is outlined in Rule 146, Rules of Practice of the U. S. Patent Office, which provides:

"146. Election of species. In the first action on an application containing a generic claim and claims restricted separately to each of more than one species embraced thereby, the examiner, if of the opinion after a complete search on the generic claims that no generic claim present is allowable, shall require the applicant in his response to that action to elect that species of his invention to which his claims shall be restricted if no generic claim is finally held allowable."

thereafter approved the application and the patent issued with this wording.[4]

Nor do any of the representations Hersch made, either in themselves or considered with the amendments, justify the placing of a limitation upon the patent claims.

The essential feature of the Hersch patent is the maintenance of a cathode so designed and so positioned in the cell as to establish between the electrolyte and the cathode a line of contact that enables the gas being tested to unite with them simultaneously at the same point, referred to as the "three-phase boundary." This method permits the oxygen molecules to be ionized without first having to diffuse through the electrolyte, as would be required if the cathode were completely submerged in or covered by a film of the electrolyte. As a result, Hersch stated, his analyzer is more sensitive and less sluggish in operation than those in which electrolyte covers the cathode. During the prosecution of the patent application, Hersch emphasized and re-emphasized that, in order to create this "three-phase boundary," his cathode was designed and operated so as to prevent electrolyte from creeping upon its unimmersed portion, and he iterated and reiterated that in this respect his cathode differed materially from Haller's, which was completely covered with a film of electrolyte. He stated, for example, that his cathode was "devoid of pores, to prevent creeping of the electrolyte on or along the exposed cathode surface such that a film of electrolyte would subsequently completely envelop the cathode," and that his invention embraced " * * the utilization of stagnant or substantially stagnant electrolytes to prevent the creeping thereof along the exposed cathode surface."

Hersch never did say that all of the unimmersed portion of his cathode was completely free of electrolyte or that there was no creep whatever above the liquid level of the reservoir. Rather, he carefully explained that the creep did not "completely" envelop the cathode, and he prefaced his statement that the electrolyte must be stagnant with other statements that showed the phrase "exposed cathode surface" meant not "the unimmersed portion of the cathode," but "the area of the cathode free of electrolyte."

■■ Our conclusion that there is no estoppel does not necessarily require a reversal of the judgment. A patent for a method or process claim is not infringed unless all of the steps or stages of the process are used [Royer v. Coupe, 146 U.S. 524, 13 S.Ct. 166, 36 L.Ed. 1073 (1892); Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 26 L.Ed. 149 (1880)], and a patent for an apparatus is not infringed unless the accused device is a copy of the claimed apparatus "either without variation, or with such variations as are consistent with its being in substance the same thing." Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929), quoting from, Burr v. Duryee, 1 Wall. 531, 573, 68 U.S. 531, 573, 17 L.Ed. 650 (1863).

■ It has already been noted that an essential feature of the Hersch patent, evidenced in the claims, is a so-called "free area" on the cathode. The court was entitled to conclude, from the materials before it on the hearing of the motion for summary judgment, that the accused analyzer did not incorporate this distinctive feature of the invention. Such was the contention of Research; and in support it submitted the affidavit of one Lawlor, a physicist, who stated that the cathode in its analyzer was so designed that a film of electrolyte completely covered it. Engelhard did file two opposing affidavits, but the court was obliged to disregard them for they contained only hearsay and legal conclusions [Gifford v. Travelers Protective Ass'n, 153 F.2d 209, 211 (9th Cir. 1946); See 6 Moore, Federal Practice 56.22, at page 2327–2328 (1953)]; and there was nothing else in the record to counter the showing made by Research.

4. Hersch did amend again, but only to meet objections of indefiniteness, etc.

■■ On this appeal Engelhard has repeatedly referred to four other affidavits, asserting that they clearly show the existence of material issues of fact, thus manifesting the error of the trial court in rendering summary judgment. The difficulty with this argument is that these affidavits were not filed at or before the time fixed for the hearing on the motion for summary judgment, as required by Fed.R.Civ.P. 56(c). They were tendered after that matter had been decided, with Engelhard's petition for rehearing, and were rejected. Since the petition was addressed to the discretion of the trial court [George P. Converse & Co. v. Polaroid Corp., 242 F.2d 116 (1st Cir. 1957)], Engelhard was obliged to show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence at the hearing. But Engelhard made no showing of any kind. Indeed from our examination of three of the four affidavits (the other was not made part of the record on appeal) it clearly appears that whatever facts they contain were readily available to and were known by Engelhard well in advance of the hearing.[5] In sum, we conclude that the district court did not err in granting summary judgment with respect to Engelhard's claims based on infringement.

The District Court concluded that the claim of unfair competition should be dismissed on the sole ground that "In the instant suit, plaintiff cannot enforce its patent against defendants, and hence plaintiff has no actionable wrong for the alleged unfair competition."

■ Again we must disagree. "The general rule, of course, is that the monopoly of a patent which entitles a patentee to damages for infringement commences only when the patent is granted; but where, in advance of the granting of a patent, an invention is disclosed to one who, in breach of the confidence thus reposed, manufactures and sells articles embodying the invention, such person should be held liable for the profits and damages resulting therefrom, not under the patent statutes, but upon the principle that equity will not permit one to unjustly enrich himself at the expense of another." Hoeltke v. C. M. Kemp Mfg. Co., 80 F.2d 912, 922–923 (4th Cir. 1936) cert. denied, 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395, approved and followed by this Circuit in Filtex Corp. v. Amen Atiyeh, 216 F.2d 443 (9th Cir. 1954). And a claim for unfair competition continues to exist even though the trade secrets are thereafter disclosed in a patent which proves to be invalid or unenforcible. Conmar Products Corp. v. Universal Slide Fastener Co., 172 F.2d 150 (2d Cir. 1949). The law of California, which concededly gov-

---

5. Engelhard also urged, as "new evidence," the file wrapper history of a patent for an oxygen analyzer (U.S. Letters Patent No. 2,992,170) issued to Research just a few days before the hearing on the motion for summary judgment. Engelhard asserted that the file wrapper contains admissions against interest; and specifically it stated that one such admission was: "while capillary attraction is present to some extent in the Hersch cell, as mentioned by the Examiner, only part of Hersch's cathode is submerged with electrolyte."

We fail to see how that statement is damaging to Research's position. Considered in conjunction with the fact that the cathode of the accused analyzer is completely wetted with electrolyte the statement only points up how that cathode differs from the cathode of the Hersch invention. We assume that Engelhard would put forth its best example of an admission. Nevertheless we have examined the entire file wrapper of the patent; without laboring the point further, it will suffice to say that we can find no statements in it which are against interest.

The remaining ground for rehearing was that file wrapper estoppel was not "raised" as an issue until the final day of the hearing on the motion for summary judgment. Engelhard is mistaken on this point. Research had pleaded the doctrine as an affirmative defense and its brief, served on counsel for Engelhard prior to the hearing, is replete with assertions regarding this subject.

erns us here, accords with the general rule in allowing damages for the wrongful appropriation of secret information. Aetna Bldg. Maintenance Co. v. West, 39 Cal.2d 198, 246 P.2d 11 (1952); Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250 (S.D.Calif.1958), aff'd per curiam, 283 F.2d 695 (9th Cir. 1960), cert. denied, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961).

Research argues that all of the information was disclosed in the Hersch patent, and that it was not until two months after the patent issued and the information was thus published that the accused analyzer was "built."

■ What the information was does not appear either in the pleadings or the record but, without deciding the matter, we shall assume for purposes of our discussion that, as Research argues, the information was connected with the process or means claimed in the patent; otherwise the issue of unfair competition would not be a related claim as required by 28 U.S.C. § 1338(b) and the District Court had no pendent jurisdiction. Hurn v. Oursler, 289 U.S. 238, 245–247, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Schreyer v. Casco Prods. Corp., 190 F.2d 921 (2d Cir. 1951), cert. denied, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1942); Darsyn Laboratories, Inc. v. Lenox Laboratories, 120 F.Supp. 42, 53–54 (D.N.J. 1954), aff'd per curiam, 217 F.2d 648 (3d Cir. 1954), cert. denied, 349 U.S. 921, 75 S.Ct. 661, 99 L.Ed. 1253 (1955).

■ Nevertheless, simply because the accused analyzer was not *built* until after the time the information was released to the public domain does not mean that the trade secrets were not wrongfully *used* before that time. In fact Research recognizes that the unfair competition count is based "on the charge that appellee used the same information set forth in the claims in the patent in suit during a period prior to the issuance of the patent." These allegations, not having been pierced by affidavits or otherwise, are sufficient to create a genuine issue of fact. Engelhard alleged that by

having the information Research was enabled to build and market its analyzer substantially sooner than if without it. Such use would give rise to a claim for damages based upon the profits resulting from the acceleration of the date when production was possible. Schreyer v. Casco Prods. Corp., 190 F.2d 921 (2d Cir. 1951), cert. denied, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1942).

Of course there are situations where even separate causes of action are so intertwined that resolution of one settles the other. American Securit Co. v. Shatterproof Glass Corp., 166 F.Supp. 813 (D.Del.1958), aff'd 268 F.2d 769 (3d Cir. 1959) cert. denied, 361 U.S. 902, 80 S.Ct. 210, 4 L.Ed.2d 157, relied upon by the lower court in reaching its conclusion, was such a case. But there the essence of the unfair competition charge was that the defendant had wrongfully induced the plaintiff not to sue on his patents and, as the court stated, "[u]nless plaintiff was legally entitled to enforce its patents against the defendant, defendant's alleged guile in inducing plaintiff to forbear action constituted no invasion of any right possessed by plaintiff." Id. 166 F.Supp. at 826.

■ Research contends that, because it was not using the invention covered by the claims and the alleged trade secrets were part and parcel of the invention, it necessarily follows that there was no unfair competition. The argument is that a decision that the claims were not infringed is tantamount to a conclusion that the alleged trade secrets were not used in the accused analyzer. But this argument is entirely without merit. We have already noted that to sustain a charge of infringement all of the elements of an invention must have been present in an accused device. But to sustain Engelhard's claim of unfair competition it is only necessary that some secret information relating to one or more essentials of the method or apparatus invented by Hersch have been misappropriated.

Finally, Research contends that Engelhard's counsel stipulated in open court

that no trade secrets were involved. But the trial court certainly did not render its decision on the basis of any such concessions; we note that our review is limited to the narrow issue, whether in the absence of infringement there could be, as a matter of law, no taking of trade secrets. The proceedings on remand will be time enough for Research to point out other grounds upon which it might prevail, if any there are.

The judgment, insofar as it holds that the patent in suit was not infringed, is affirmed; and insofar as the judgment holds that Engelhard has no claim for unfair competition, it is reversed and the cause remanded for further proceedings not inconsistent with this opinion. No costs are allowed.