350 F.2d 134
 146 U.S.P.Q. 422
 WINSTON RESEARCH CORPORATION, Charles S. Tobias and Wayne R.
Johnson, Appellants,
v.
MINNESOTA MINING AND MANUFACTURING COMPANY, a corporation, Appellee.
MINNESOTA MINING AND MANUFACTURING COMPANY, a corporation,
Cross-Appellant,
v.
WINSTON RESEARCH CORPORATION, Charles S. Tobias and Wayne R.
Johnson, Cross-Appellees.
 No. 19409.
 United States Court of Appeals Ninth Circuit.
 July 9, 1965, Rehearing Denied Aug. 18, 1965.
 
 Keith D. Beecher, Los Angeles, Cal., Wm. Douglas Sellers, Pasadena, Cal., Laurence B. Dodds, Little Neck, N.Y., for appellants-cross appellees.
 William H. Pavitt, Jr., Ellsworth R. Roston, Charles H. Schwartz, Smyth, Roston & Pavitt, Los Angeles, Cal., for appellee-cross appellant.
 Before JERTBERG and BROWNING, Circuit Judges, and FOLEY, District judge.
 BROWNING, Circuit Judge:
 
 
 1
 The Mincom Division of the Minnesota Mining and Manufacturing Company developed an improved precision tape recorder and reproducer. Somewhat later, Winston Research Corporation developed a similar machine. Mincom alleged that the Winston machine was developed by former employees of Mincom, including Johnson and Tobias, by using confidential information which they had acquired while working on the Mincom machine, and sued for damages and an injunction. The district court granted Mincom an injunction, but denied damages. Both sides appealed.
 
 
 2
 * Some background is required for an understanding of the issues.
 
 
 3
 For some uses of precision tape recorder/reproducers, the time interval between coded signals must be recorded and reproduced with great accuracy. To accomplish this, the tape must move at as constant a speed as possible during both recording and reproduction, and any changes in tape speed during recording must be duplicated as nearly as possible during reproduction. The degree to which a particular tape recorder/reproducer accomplishes, this result is measured by its 'time-displacement error.'
 
 
 4
 An electronic device known as a 'servo' system is commonly used to reduce time-displacement error by detecting fluctuations in tape speed and immediately adjusting the speed of the motor. Machines prior to the Mincom machine employed a flywheel to inhibit fluctuation in tape speed by increasing the inertia of the system. However, the flywheel reduced the effectiveness of the servo system since the increased inertia prevented rapid adjustments in the speed of the motor.
 
 
 5
 The effectiveness of the servo system in prior machines was also reduced by resonances created by the moving parts. The range of sensitivity of the servo system was limited to exclude the frequencies of the interfering resonances. This had the disadvantage of limiting the capacity of the servo system to respond to a full range of variations in the speed of the tape.
 
 
 6
 To solve these problems Mincom eliminated the flywheel and reduced the mass of all other rotating parts. This reduced the inertia of the tape transport system, permitting rapid adjustments in tape speed. Interfering resonances were eliminated by mechanical means. This permitted use of a servo system sensitive to a wide range of frequencies, and hence capable of rapid response to a wide range of variations in tape speed. After four years of research and development based upon this approach, Mincom produced a successful machine with an unusually low time-displacement error.
 
 
 7
 In May 1962, when Mincom had substantially completed the research phase of its program and was beginning the development of a production prototype, Johnson, who was in charge of Mincom's program, left Mincom's employment. He joined Tobias, who had previously been discharged as Mincom's sales manager, in forming Winston Research Corporation. In late 1962, Winston contracted with the government to develop a precision tape reproducer. Winston hired many of the technicians who had participated in the development of the Mincom machine to work on the design and development of the Winston machine.
 
 
 8
 In approximately fourteen months, Winston completed a machine having the same low time-displacement error as the Mincom machine.
 
 II
 
 9
 Conflicting policy considerations come into play in deciding what limitations should be imposed upon an employee in the use and disclosure of information acquired in the course of a terminated employment relationship-- or, conversely, what protection should be extended to the former employer against use and disclosure of such information.[1]
 
 
 10
 On the one hand, restrictions upon the use and disclosure of such information limit the employee's employment opportunities, tie him to a particular employer, and weaken his bargaining power with that employer. Such restrictions interfere with the employee's movement to the job in which he may most effectively use his skills. They inhibit an employee from either setting up his own business or from adding his strength to a competitor of his employer, and thus they diminish potential competition. Such restrictions impede the dissemination of ideas and skills throughout industry. The burdens which they impose upon the employee and society increase in proportion to the significance of the employee's accomplishments, and the degree of his specialization.
 
 
 11
 On the other hand, restrictions upon an employee's disclosure of information which was developed as a result of the employer's initiative and investment, and which was entrusted to the employee in confidence, are necessary to the maintenance of decent standards of morality in the business community. Unless protection is given against unauthorized disclosure of confidential business information by employees, employee-employer relationships will be demoralized; employers will be compelled to limit communication among employees with a consequent loss in efficiency; and business, espionage, deceit, and fraud among employers will be encouraged.
 
 
 12
 An additional argument is sometimes made in favor of protecting confidential but unpatented matter from disclosure, but we think the rationale of Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), precludes us from giving it weight. We refer to the contention that the results of research and development must be accorded reasonable protection from disclosure or private investment in such activities will be inhibited and progress will be slowed, with consequent loss to both employers and public. The patent laws, it is argued, do not afford adequate protection because excessive time is required to process a patent application, and because a high standard of invention must be met to obtain a patent, or at least to sustain a patent once issued. However, we are satisfied that the rationale of Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, supra, precludes judicial recognition of a legally protectible interest in the secrecy of industrial information as such, as distinguished from an interest in the integrity of confidential employer-employee relationships.[2]
 
 III
 
 13
 We turn to the issues.
 
 
 14
 The district court found, and Winston concedes, that Johnson and the other former Mincom employees based Winston's development program upon the same approach to the problem of achieving a low time-displacement error as they had pursued in developing the Mincom machine. The district court further found that this general approach was not a trade secret of Mincom's. Finally, the district court found that the particular embodiment of these general concepts in the Mincom machine was Mincom's trade secret, and had been improperly utilized by the former Mincom employees in developing the Winston machine.
 
 
 15
 Mincom contends that the court defined Mincom's trade secrets too narrowly; Winston, that the court's definition was too broad.
 
 
 16
 In describing Mincom's trade secrets in the judgment, the district court first outlined the general approach which both Mincom and Winston followed in the development of their machines, closing with the phrase, 'as accomplished and adopted by' Mincom. The court then set out the detailed specifications of the various elements of the Mincom machine. Winston reads the court's initial outline of the general approach as a determination that this was itself a Mincom trade secret, and then vigorously attacks this supposed determination.
 
 
 17
 We read the initial description of the general approach as merely introductory to, and limited by, the detailed specifications which follow. We think the district court rejected Mincom's contention that the general approach itself was a Mincom trade secret-- and properly so. There was expert testimony that if a technician in the field were asked to design a machine having the time-displacement error achieved by the Mincom machine he would adopt the general approach of reducing the inertia of rotating parts and utilizing a wide band servo system-- that this approach was dictated by well known principles of physics. It was therefore not protectible under accepted trade secret doctrine. It was not 'secret,' for it consisted essentially of general engineering principles in the public domain and part of the intellectual equipment of technical employees. Its disclosure could not be treated as betrayal of a confidence placed by Mincom in its technical employees.
 
 
 18
 Winston points out that the basic mechanical elements of the Mincom machine were found in various publicly known recorder-reproducers, and that all of them were disclosed in a patent issued to Johnson and assigned to Mincom in 1961. But there was substantial evidence that the specifications of these basic mechanical elements and their relationship to each other embodied in the Mincom machine and detailed in the district court's judgment were not publicly known, and were arrived at by Mincom only after painstaking research and extensive trial and error.
 
 
 19
 As we read the findings and judgment, it was these specifications and relationships which the court found to constitute Mincom's trade secret, and not the general approach itself or the basic mechanical elements as such. We think this determination was correct.
 
 
 20
 Winston argues that certain of the specifications of the Mincom machine were originated by Winston rater than by Mincom. The district court's contrary finding has substantial support in the record.
 
 
 21
 Winston also suggests that the specifications were 'mere choices of engineering design,' and not of critical importance. Even if this were so, they were choices made first by Mincom, and gave Mincom a product having superior characteristics which Winston achieved only by utilizing elements with substantially the same specifications.[3]
 
 
 22
 Winston argues that information is protected from disclosure only if communicated to the employee by the employer who is seeking protection, and that the information involved in this case was not disclosed by Mincom to the employees subsequently hired by Winston, but rather was developed by these employees themselves, albeit while employed by Mincom.
 
 
 23
 We need not examine the soundness of the rule for which Winston contends, or its applicability to a case such as this in which a group of specialists engaged in related facets of a single development project change their employer. The rule is apparently based upon the notion that unless the first employer conveys the information to the employee, subsequent disclosure by the employee cannot be a breach of a duty of confidence owed that employer. Futurecraft Corp. v. Clary Corp., supra, note 1, 23 Cal.Rptr. 198. As the court in Futurecraft recognized, an obligation not to disclose may arise from circumstances other than communication in confidence by the employer. It may also rest upon an express or implied agreement. In the present case, an agreement not to disclose might be implied from Mincom's elaborate efforts to maintain the secrecy of its development program, and the employees' knowledge of these efforts and participation in them. In any event, Mincom and its employees entered into express written agreements binding the latter not to disclose confidential information, and these agreements did not exclude information which the employee himself contributed.[4]
 
 
 24
 Winston challenges the district court's determination that 'knowledge of the reasons for' the particular specifications of the Mincom machine, and 'knowledge of what not to do * * * and how not to make the same mistakes' as Mincom had made in arriving at these specifications, were Mincom trade secrets. Winston's objection seems directed more to the relief which the court granted, as applied to these matters, than to their classification as trade secrets. The contention will be considered later with others relating to remedy.
 
 
 25
 Mincom contends that the district court erred in holding that certain information did not constitute Mincom trade secrets. However, as we note below in discussing the remedy granted, Mincom would not have been entitled to additional relief even if the court had classified these items as trade secrets, and review of the correctness of the court's classification would therefore serve no useful purpose.
 
 IV
 
 26
 The district court enjoined Winston Research Corporation, Johnson, and Tobias from disclosing or using Mincom's trade secrets in any manner for a period of two years from the date of judgment-- March 1, 1964. The court also required the assignment of certain patent applications to Mincom. No damages were awarded.
 
 
 27
 Winston contends that Mincom was guilty of 'unclean hands' with respect to the subject matter in controversy, and should therefore have been barred from any equitable relief. The argument is based upon two circumstances.
 
 
 28
 First, the employment contracts which Mincom executed with its employees contained a provision that the contracting employee would not render services to a competitor of Mincom for a period of two years after termination of employment with Mincom. Mincom concedes that this provision is void in California. Cal. Bus. & Prof. Code, 16600, supra note 4. Winston asserts that Mincom included this provision in its contracts with California employees with the deliberate purpose of misleading employees in that state as to their legal rights, and coercing them to refrain from competing with Mincom. There was no direct evidence to that effect; Winston relies entirely upon evidence that Mincom continued for many years to include the provision in contracts executed by California employees. On the other hand, the language of the contracts suggests that they contained this provision only because Mincom used the same form of employment agreement throughout its nationwide operation, and there was evidence that Mincom had never sought to enforce the provision in California. Furthermore, there was evidence that Tobias and Johnson were aware of the unenforceability of the provision in California, and no evidence that any Mincom employee was ever in fact deterred by it.
 
 
 29
 The second circumstance upon which Winston relies as establishing Mincom's 'unclean hands' is that Mincom representatives allegedly offered to forego action against Winston if Winston would agree not to compete with Mincom in the precision recorder field. However, the district court found, on conflicting testimony, that the condition sought to be imposed was that Winston agree only to 'refrain from use of (Mincom's) trade secrets and confidential information in any competition with' Mincom. We are satisfied that this district court finding was not clearly erroneous.[5]
 
 
 30
 As we have noted, the district court enjoined disclosure or use of the specifications of Mincom's machine for a period of two years from the date of judgment. Mincom argues that the injunction should have been permanent, or at least for a substantially longer period. Winston contends that no injunctive relief was appropriate.
 
 
 31
 Mincom was, of course, entitled to protection of its trade secrets for as long as they remained secret. The district court's decision to limit the duration of injunctive relief was necessarily premised upon a determination that Mincom's trade secrets would shortly be fully disclosed, through no fault of Winston, as a result of public announcements, demonstrations, and sales and deliveries of Mincom machines. Mincom has not seriously challenged this implicit finding, and we think the record fully supports it.
 
 
 32
 Mincom argues that notwithstanding public disclosure subsequent to its former employees' breach of faith, Mincom was entitled to a permanent injunction under the Shellmar rule. Winston responds that under the competing Conmar rule public disclosure of Mincom's trade secrets would end the obligation of Mincom's former employees to maintain the information in confidence, and that neither the employees nor their privies may be enjoined beyond the date of disclosure.[6]
 
 
 33
 Thus, Winston's argument would bar any injunction at all once there was public disclosure, and Mincom's argument would require an injunction in perpetuity without regard to public disclosure. The district court rejected both extremes and granted an injunction for the period which it concluded would be sufficient both to deny Winston unjust enrichment and to protect Mincom from injury from the wrongful disclosure and use of Mincom's trade secrets by its former employees prior to public disclosure.
 
 
 34
 We think the district court's approach was sound. A permanent injunction would subvert the public's interest in allowing technical employees to make full use of their knowledge and skill and in fostering research and development. On the other hand, denial of any injunction at all would leave the faithless employee unpunished where, as here, no damages were awarded; and he and his new employer would retain the benefit of a headstart over legitimate competitors who did not have access to the trade secrets until they were publicly disclosed. By enjoining use of the trade secrets for the approximate period it would require a legitimate Mincom competitor to develop a successful machine after public disclosure of the secret information,[7] the district court denied the employees any advantage from their faithlessness, placed Mincom in the position it would have occupied if the breach of confidence had not occurred prior to the public disclosure, and imposed the minimum restraint consistent with the realization of these objectives upon the utilization of the employees' skills.
 
 
 35
 Mincom relies upon two California cases in which permanent injunctions were granted,[8] and upon general language in another,[9] to demonstrate that the Shellmar rule is California law. It is enough to say that the duration of injunctive relief was not an issue and was not discussed in any of these cases. In the absence of substantial reason to doubt it, we accept the district court's reasoned conclusion as to the rule the California Supreme Court would probably follow.[10]
 
 
 36
 Mincom argues that in any event a two-year injunction from March 1, 1964, was not sufficient to overcome the wrongful advantage obtained by Winston. Mincom points out that four years were required to develop its machine, whereas Winston developed its machine in fourteen months. For this reason, and because the injunction was stayed for some time, Mincom argues that injunctive relief should be granted for at least three years from the completion of appellate review.
 
 
 37
 As we have noted, the appropriate injunctive period is that which competitors would require after public disclosure to develop a competitive machine. The time (fourteen months) which Winston in fact took with the aid of the very disclosure and use complained of by Mincom would seem to be a fair measure of the proper period. The district court granted an injunction for a somewhat longer period, presumably because the Mincom machine was built in such a way as to require some time for persons unfamiliar with it to determine the details of its construction, and to compensate for delay which Mincom encountered in the final stages of its development program because Winston had hired away Mincom's key personnel. Whether extension of the injunctive period for the latter reason was proper we need not decide, for Winston has not raised that question.
 
 
 38
 We think it was proper to make the injunctive period run from the date of judgment since public disclosure occurred at about that time. The stays subsequently granted by the district court and this court were limited in scope and do not justify an extension of the injunctive period.
 
 
 39
 Winston argues that injunctive was not appropriate because it obstructed and delayed further important research and development by Winston, and (somewhat inconsistently with its successful argument that no damages had been proved) because money damages would have afforded an adequate remedy. In deciding to grant injunctive relief, and in framing its decree, the district court evidenced a keen awareness of the impact of its decision upon the public interest. We think the court acted reasonably and within its discretion in granting a limited injunction, particularly in light of the stay granted by the district court (and subsequently extended by this court) to allow access by the interested government agencies to Winston's machine.
 
 
 40
 Winston contends that several provisions of the decree are not sufficiently 'specific in terms' to satisfy Fed.R.Civ.P. Rule 65(d). As we have said, references in the decree to the general approach adopted by Mincom are to be read as limited by the particular specifications of the basic mechanical elements of the Mincom machine and their relationship to each other which are subsequently detailed in the decree. Similarly, the reference in the decree to a 'shortened and widened' shaft derives the requisite specificity from a context which clearly related these generalized directions to a specific result to be achieved.
 
 
 41
 We agree with Winston that in one respect the district court's injunction was unenforceably broad. As we have noted, the district court found that 'knowledge of the reasons for' the particular specifications of the Mincom machine, and 'knowledge of what not to do * * * and how not to make the same mistakes' as Mincom made in arriving at these specifications were Mincom trade secrets. Disclosure or use of these 'trade secrets' was enjoined. Winston argues that these provisions of the decree are too broad and indefinite, prohibit use by former Mincom employees of their personal knowledge and skill, and render these employees substantially unemployable in the work for which their specialized training and experience have equipped them. Mincom responds that the provisions are to be read narrowly as applying only to knowledge of the reasons for the particular specifications of the Mincom machine which the court held to be protectable trade secrets, and of mistakes to be avoided in developing these specifications.
 
 
 42
 Even so read, the provisions cannot stand, for their necessary effect is to prohibit conduct by Tobias, Johnson, and the other former Incom employees in which they have a right to engage. As we have said, the general approach adopted by Mincom in the development of its machine and the basic mechanical elements incorporated in that machine were not protectible 'trade secrets,' since they were generally known. Mincom's former employees-- and Winston-- are free to utilize both in their efforts to build a machine equal or superior to the Mincom machine, so long as they do not, within the time covered by the injunction, utilize the particular specifications of the Mincom machine or their substantial equivalents. Moreover, Mincom's former employees cannot be denied the right to use their general skill, knowledge, and experience, even though acquired in part during their employment by Mincom. But the only practical way of enforcing the broad injunctive provisions here challenged would be to prohibit former Mincom employees from engaging in any development work in this area at all. They simply could not exclude their knowledge 'of what not to do' and of why Mincom's machine was built as it was from any development work they might now attempt involving the general approach and basic mechanical elements of the Mincom machine.
 
 
 43
 Moreover, such broad injunctive provisions are unnecessary. The specific provisions of the decree are both sufficient and readily enforceable. If Mincom's former employees disclose or utilize the Mincom design features detailed in the district court's judgment, or their substantial equivalents, alert enforcement of the specific provisions of the decree will amply protect Mincom's rights without improperly restricting either its former employees or potential competitors.
 
 
 44
 Mincom argues that the district court should have awarded money damages as well as injunctive relief. We think the district court acted well within its discretion in declining to do so. Since Winston sold none of its machines, it had no past profits to disgorge. The evidence as to possible future profits was at best highly speculative. To enjoin future sales and at the same time make an award based on future profits from the prohibited sales would result in duplicating and inconsistent relief, and the choice which the district court made between these mutually exclusive alternatives was not an unreasonable one. There was evidence that Winston would probably sell its machine and realize profits after the injunction expired, but these sales and profits, as we have seen, would not be tainted by breach of confidence, since Winston could by that time have developed its machine from publicly disclosed information.
 
 
 45
 We have examined the other bases upon which Mincom sought damages and are satisfied that they were either too remote and speculative, or that the injunction made Mincom as nearly whole as possible. Mincom argues that Winston gained a wide variety of advantages from the improper use of Mincom's trade secrets-- such as obtaining financing for its development program, securing a government contract, shortening its development program, and reducing its development costs. There is an obvious difficulty in assigning a dollar value to such matters. The two-year injunction deprived Winston of any benefit it might have gained from these advantages and shielded Mincom from any potential harm from Winston's competition which these advantages may have rendered unfair. Mincom suggests that by hiring away Mincom's skilled employees Winston hindered Mincom's development program and increased its cost, but, as we have noted, the district court expressly considered this delay and extended the period of the injunction for an equivalent period.[11]
 
 
 46
 As noted earlier, Mincom contends that the district court erred in holding that certain items of information were not Mincom trade secrets. The first of these was knowledge of the low time-displacement error achieved in the Mincom machine and precise data as to inertia of its moving parts. Former Mincom employees were said to have used this information in the development of the Winston machine, and also to have disclosed it to others to induce them to finance Winston. Another such item was knowledge of the particular experience of Mincom's former employees, which Winston is said to have used in selecting those to be hired, and to have disclosed to aid it in obtaining financing and in securing a government development contract. A final item was the knowledge that certain government representatives were aware of the performance characteristics of Mincom's machine and were interested in acquiring equipment with such characteristics. This knowledge Winston also is said to have used in securing the government development contract.
 
 
 47
 Some of the information described clearly did not qualify as a trade secret on the record in this case; as to some the question may have been close. But, if the court erred in its refusal to classify any of these items as a trade secret, there is nothing to indicate that the error was prejudicial. The injunction itself denied Winston any benefits and protected Mincom from any adverse consequences that might have resulted from the improper disclosure and use of this information. Nothing in the record indicates that classifying the information as a trade secret would have justified either an extension of the injunctive period or an award of damages.
 
 
 48
 Winston contends that Mincom should have been denied any relief because it failed to identify the particular matters which it considered its trade secrets, either before or during trial, although Winston sought to obtain this information by both formal and informal means. The language of the memorandum of the trial court in Futurecraft Corp. v. Clary Corp., upon which Winston relies,[12] relates to the necessity for a showing by the employer that the information sought to be protected does not fall within the category of general employee knowledge and skill. We think Mincom discharged that burden with respect to the particular specifications which the district court held to be protectible. However, the fact that Mincom sought protection indiscriminately for all phases of its development program, and refused Winston's request for a more realistic statement of its claim during the initial stages of Winston's own development program, afforded an additional justification for the district court's refusal to award money damages.[13]
 
 V
 
 49
 Mincom's employment contracts required its employees to assign to Mincom inventions conceived during employment, and inventions conceived within one year of termination of employment which were 'based upon' confidential information. Mincom sought to require the assignment of one patent and a number of patent applications. The district court received evidence as to when each invention was conceived and its relationship to Mincom's secrets.
 
 
 50
 The district court found that three patent applications involved inventions conceived during the inventors' employment by Mincom, and ordered assignment on that basis. We think these findings have support in the record and are not clearly erroneous.
 
 
 51
 The district court further found that a patent and two patent applications (identified as Beecher Dockets K 260 and K 288) related to inventions conceived after termination of the inventors' employment by Mincom. The district court concluded that the invention disclosed in the patent was not 'based upon' Mincom's confidential information, and therefore need not be assigned. We think this finding was supported by the record. However, the district court found that the inventions disclosed in the two patent applications were 'based upon' Mincom's secrets, and ordered assignment. The evidence in support of this finding consists of drawings from the two patent applications and brief explanatory testimony from the inventors. Nothing in this testimony or on the face of the drawings suggests any relationship between these inventions and confidential Mincom information. If these applications do in fact involve Mincom trade secrets, other portions of the judgment will preclude their use by Winston for the two-year injunctive period, but the record made by Mincom does not justify requiring their assignment.
 
 VI
 
 52
 Winston developed a second machine after entry of the district court judgment. Following a show-cause proceeding, the district court found that the second machine 'used substantially the process derived from the trade secrets' of Mincom 'as set forth in the amended Judgment,' and held Winston in contempt.
 
 
 53
 Mincom was entitled to protection during the life of the injunction against substantial duplication of its trade secrets, and nothing more or less. We think the district court applied the proper standard and that its finding is suported by the evidence.
 
 
 54
 All of Paragraph 1(d) of the judgment, the phrase 'and knowledge of the reasons for' in paragraph 1(b), and the letters and numbers 'K-260 and K-288' in paragraph 4, will be stricken. In all other respects the judgment is affirmed.
 
 
 
 [1]
 See particularly Futurecraft Corp. v. Clary Corp., 205 Cal.App.2d 279, 23 Cal.Rptr. 198 (Dist.Ct.App.1962), quoting with approval from Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430 (1960). Recent law review discussions include Levitin, 14 Clev.-Mar. L.Rev. 157, 159-63 (1965); Note, 39 Notre Dame L. Rev. 200, 202 (1964); Hays, 51 Calif. L. Rev. 51 (1963); Comment, 38 N.Y.U.L. Rev. 324, 329 (1963); Comment, 29 U. Chi. L. Rev. 339, 351 (1962); Note, 37 Ind. L.J. 218, 221 (1962); Marcuse, 36 Conn. B.J. 348 (1962); Stedman, 23 Ohio St. L.J. 4, 22-24, 28-30 (1962); von Kalinowski, 47 Va. L. Rev. 583-584 (1961); Blake, 73 Harv. L. Rev. 625, 648-50, 679 (1960)
 
 
 [2]
 In Sears, Roebuck & Co. v. Stiffel Co., the Supreme Court held that the federal patent statutes reflect a congressional determination that 'the Progress of Science and Useful Arts' (U.S. Const. Art. I, 8, cl. 8), is best served by limiting the right to exclude others from new developments to 'genuine invention,' and then for a period no longer than fourteen or seventeen years, and that the states may not 'under some other law, such as that forbidding unfair competition, give protection of a kind that clashes with the objectives of the federal patent laws.' 376 U.S. at 231, 84 S.Ct. at 789
 The federal patent statutes require full disclosure of the invention as a condition to the grant of monopoly so that at the end of the period of monopoly the development may be freely available to all. Thus, the federal patent statutes would seem to reflect a congressional determination that any individual or social interests which may be served by secrecy are outweighed by those served by full disclosure. And it would seem to follow, under the rationale of Sears, Roebuck & Co. v. Stiffel Co., that state law providing protection for trade secrets cannot be applied to serve a premise that the balance of interests favors secrecy. Thus, state law protecting trade secrets cannot be based 'on a policy of rewarding or otherwise encouraging the development of secret processes or devices. The protection is merely against breach of faith and reprehensible means of learning another's secret.' Restatement, Torts 757, comment b.
 Professor John C. Stedman has suggested a legislative response to the policy arguments favoring secrecy. Professor Stedman proposes a federal statute to protect trade secrets for a period of five years in return for disclosure and regulation. A lesser standard of novelty would be imposed than is required of patentable 'invention'. Relief would be limited to reasonable royalty for unauthorized use, rather than injunction. No protection of any kind would be given to nonregistered trade secrets after disclosure, even though the disclosure was a breach of confidence. Stedman, 23 Ohio St. L.J. 4, 32-34 (1962). For other legislative proposals see Klein, 55 Nw. U.L. Rev. 437, 459-61 (1960).
 
 
 [3]
 'A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. * * * It may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make.' Restatement, Torts 757, comment b. California has adopted the Restatement's definition of a trade secret. Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250, 256-257 (S.D.Cal. 1958); Futurecraft Corp. v. Clary Corp., supra note 1, 23 Cal.Rptr. at 211; By-Buk Co. v. Printed Cellophane Tape Co., 163 Cal. App.2d 157, 166, 329 P.2d 147 (Dist.Ct.App. 1958)
 
 
 [4]
 The employment agreements contained a provision restricting the right of the employee to work for a competitor of Mincom after termination of employment, contrary to Cal.Bus. & Prof.Code 16600. But as the district court held, under California law the void provision was severable and the remainder of the contract fully enforceable. Zajicek v. Kool Vent Metal Awning Corp., 283 F.2d 127, 131 (9th Cir. 1960). As we note later, we also agree with the district court that in the circumstances of this case use in California of contracts containing this unenforceable provision did not require the court to deny Mincom equitable relief for unclean hands
 
 
 [5]
 Since Winston relied upon its version of Mincom's offer to forego suit as the basis for its charge of attempted monopolization by Mincom, our acceptance of the district court's finding also requires affirmance of the district court's dismissal of Winston's antitrust counterclaim
 
 
 [6]
 The two rules take their names from Shellmar Prods. Co. v. Allen-Qualley Co., 87 F.2d 104 (7th Cir. 1936), and Conmar Prods. Corp. v. Universal Slide Fastener Co., 172 F.2d 150 (2d Cir. 1949). These decisions and their respective progeny are exhaustively considered in Turner, Law of Trade Secrets 427-58 (1962)
 
 
 [7]
 Compare Engelhard Indus., Inc. v. Research Instrumental Corp., 324 F.2d 347 (9th Cir. 1963), where the argument advanced against a claim of misappropriation was that the accused device was not built until after public disclosure. In answer, this court stated:
 'Nevertheless, simply because the accused (device) was not built until after the time the information was released to the public domain does not mean that the trade secrets were not wrongfully used before that time. * * * Such use would give rise to a claim for damages based upon the profits resulting from the acceleration of the date when production was possible.' 324 F.2d at 353.
 
 
 [8]
 Ungar Electric Tools, Inc. v. Sid Ungar Co., 192 Cal.App.2d 398, 13 Cal.Rptr. 268 (Dist.Ct.App.1961); By-Buk Co. v. Printed Cellophane Tape Co., 163 Cal.App.2d 157, 329 P.2d 147 (Dist.Ct.App.1958)
 
 
 [9]
 Hollywood Motion Picture Equip. Co. v. Furer, 16 Cal.2d 184, 189, 105 P.2d 299, 302 (1940)
 
 
 [10]
 See also, Bellon v. Heinzig, 347 F.2d 4 n. 3 (9th Cir. 1965)
 
 
 [11]
 As we have also noted, whether the district court properly extended the injunctive period for this reason is not before us, and we express no view on the matter
 
 
 [12]
 The language appears in a footnote of the opinion of the District Court of Appeal at 298 of 205 Cal.App.2d, 204 of 23 Cal.Rptr.:
 "* * * plaintiff seeking prohibitory judgment must carry the burden of identifying and isolating the particular products of the mind in which he claims to have a right of private property * * * (and plaintiff) has not sustained the burden of identifying or isolating that part of said knowledge or skill so acquired. * * *"
 
 
 [13]
 Cf. Vulcan Detinning Co. v. American Can Co., 75 N.J. Eq. 542, 73 A. 603 (1909)