**LAMB–WESTON, INC.,**
**Plaintiff–Appellee,**

v.

**McCAIN FOODS, LTD.; McCain Foods, Inc., Defendants–Appellants.**

No. 91–35476.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 31, 1991.

Decided Aug. 12, 1991.

Corinne Chandler, Seyfarth, Shaw, Fairweather & Geraldson, San Francisco, Cal., Alan L. Unikel, Harold C. Wheeler, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendants-appellants.

Robert E. Rohde, Ramsey M. Al–Salam, Bogle & Gates, Seattle, Wash., David Canary, Bogle & Gates, Portland, Or., for plaintiff-appellee.

Before WRIGHT, BEEZER and WIGGINS, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Lamb–Weston's attempt to spiral ahead of its competitors was allegedly thwarted by the misappropriation by McCain of Lamb–Weston's trade secrets for manufacturing curlicue french fries. To keep Lamb–Weston from being left to twist in the wind before the trial on the merits, an eight-month preliminary injunction was imposed, barring McCain from producing or selling products made with the technology in question. McCain appeals and we affirm.

## I

Lamb–Weston, a potato processor, began in 1986 to develop the technology for producing curlicue french fries. The unique process involved a helical blade and water-feed system. McCain, a competitor, began work on a manufacturing process for curlicue fries in 1989.

In January 1990, McCain approached several Lamb–Weston employees to help its development. At that time, Richard Livermore, who had helped create the Lamb–Weston blade and process, allegedly gave McCain a copy of Lamb–Weston's confidential patent application. Livermore later went to work for McCain. Subsequently, Jerry Ross, the independent contractor who fabricated the Lamb–Weston blade, was hired by McCain to craft a helical blade for it. McCain left the decisions about the specifications, materials and manufacturing process to Ross, knowing he was still working on Lamb–Weston's blades.

Lamb–Weston was issued two patents for its blade system on May 22, 1990. In August, after discovering Ross was working for McCain, Lamb–Weston had him sign a confidentiality agreement. Contemporaneously, it sent a letter to McCain asserting concern that McCain was misappropriating its trade secrets. In October, Lamb–Weston insisted Ross sign an exclusivity agreement. McCain then requested and received from Ross all the information he had on the McCain blade.

According to Lamb–Weston, with the help of Ross and Livermore, McCain built a prototype before the patents issued in May 1990. By June, McCain had the blades hooked up to a prototype water-feed system and by December was producing curlicue fries.

During the following month, Lamb–Weston sued for misappropriation of trade secrets. The parties consented to proceedings before a magistrate judge, who entered an eight-month preliminary injunction against McCain in March 1991.[1]

## II

McCain asserts that the court abused its discretion in granting the injunction because it based its determination of probable success on the merits on clearly erroneous findings. It contends that it had no reason to know that trade secrets were being transmitted through Ross, as he was an independent contractor who assured McCain that there would be no confidentiality problems.

▆ Misappropriation of trade secrets under Oregon law requires a showing of (1) a valuable commercial design, (2) a confidential relationship between the party asserting trade secret protection and the party who disclosed the information and (3) the key features of the design that were the creative product of the party asserting protection. *Holland Dev. v. Manufacturers Consultants*, 81 Or.App. 57, 62, 724 P.2d 844, 847 (1986).

1. Oregon law governs this diversity action. Oregon has adopted the Uniform Trade Secrets Act. 1989 Or.Rev.St. § 646.475. Where there is no Oregon law on point, we have looked to other courts' interpretations of the Act for guidance.

This court reviews for abuse of discretion the grant or denial of a preliminary injunction. The use of an erroneous legal standard, the misapplication of law or a clearly erroneous finding of fact may serve as grounds for reversal. *Big Country Foods v. Board of Educ.*, 868 F.2d 1085, 1087 (9th Cir.1989).

■ Circumstantial evidence supports the court's preliminary conclusion that despite Ross's assurance he would not breach confidentiality, McCain knew that he would. McCain hired him knowing he was working on Lamb–Weston's blade. McCain told him to build a helical blade but said nothing about how he was to do it. In contrast, Lamb–Weston had specified what materials, dimensions and process to use. As a practical matter, it would be difficult for a person developing the same technology for two clients not to use knowledge gained from the first project in producing the second. This is obviously true here because McCain left the development to Ross.

■ McCain points to Ross's testimony that he left both the McCain and Lamb–Weston blades in the open where anyone could see them. McCain argues this shows that Lamb–Weston knew Ross was working on a McCain blade but was unconcerned about breaches of confidence. It was not clear error for the court to reject this proposition. Ross's failure to keep the blades segregated suggests he was using the same information to build both blades.

Furthermore, Lamb–Weston employees testified that they did not see the McCain blade at Ross's shop and that, when they learned in August 1990 that Ross was working for McCain, Lamb–Weston had him sign a confidentiality agreement. This demonstrates Lamb–Weston was concerned about protecting its trade secrets.

■ Probable success in showing misappropriation is also supported by testimony that Livermore gave McCain a copy of the confidential patent application five months before the patent issued. McCain did not challenge this testimony.[2]

The district court's findings were not clearly erroneous. The court determined correctly that Lamb–Weston showed a probability of success on the merits. The court's granting of the injunction was not an abuse of discretion.

### III

McCain argues that the court abused its discretion by imposing a geographically overbroad injunction. The court enjoined it from selling curlicue french fries worldwide even though Lamb–Weston's foreign market is limited.[3] Arguing that Lamb–Weston cannot be harmed in countries where it is not selling, McCain urges this court to limit the injunction to those countries where Lamb–Weston actually sells its product.

---

**2.** In its reply brief, McCain argues that the Lamb–Weston information Ross had was not confidential. We decline to address arguments not raised in the appellant's opening brief. *See Sanchez v. City of Santa Ana,* 915 F.2d 424, 430 (9th Cir.1990).

Were we to view this argument as part of McCain's assertion that it did not know Ross was breaching any confidentiality and address it, we would find no clear error. McCain acknowledges that at the outset Ross orally agreed to keep Lamb–Weston's information confidential. It also does not challenge the finding that the blade and the fabrication process were trade secrets.

In addition, Lamb–Weston's efforts to secure first a written confidentiality agreement and then an exclusivity agreement show it believed the information Ross had was confidential. *See Holland Dev. v. Manufacturers Consultants,* 81

Or.App. 57, 62–63, 724 P.2d 844, 847–48 (1986) (finding a confidential relationship existed and noting that the employer would not invest time and money to develop a project simply to allow its employee to turn around and use the developed technology for personal benefit); *E.V. Prentice Dryer Co. v. Northwest Dryer & Machinery Co.,* 246 Or. 78, 81–82, 424 P.2d 227, 229 (1967) (finding no confidentiality agreement where the information was not of a confidential nature and there was nothing in the employment relationship indicating that the plaintiff wanted it to be secret).

**3.** McCain contends that Lamb–Weston's only foreign markets are in England, Japan and Canada. Lamb–Weston claims that it also has sold or attempted to sell its fries in Europe, Australia and Brazil.

■ A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction. Appellate review of those terms "is correspondingly narrow." *Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n. 16 (9th Cir.1982). Injunctive relief, however, must be tailored to remedy the specific harm alleged. *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C.Cir.1976); *see also Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979) ("injunctive relief should be no more burdensome to the defendants than necessary to provide complete relief to the plaintiffs"). An overboard injunction is an abuse of discretion. *United States v. BNS, Inc.*, 858 F.2d 456, 460 (9th Cir.1988).

■ McCain's reliance on *Mantek Div. of NCH Corp. v. Share Corp.*, 780 F.2d 702 (7th Cir.1986), is not persuasive. The case involved violations of covenants not to compete signed by the plaintiff's former employees. The injunction barred the defendants from calling on the plaintiff's actual and potential customers. Noting that the injunction was to protect the goodwill the plaintiff had built up with its customers through its sales staff and reasoning that the plaintiff had no goodwill with respect to unsolicited but potential customers, the court held enjoining the defendants from approaching the unsolicited ones was an abuse of discretion. *Id.* at 710–11.

The interest protected here is fundamentally different. An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained. *Winston Research Corp. v. Minnesota Mining and Mfg.*, 350 F.2d 134, 141 (9th Cir.1965). A worldwide injunction here is consistent with those goals because it "place[s the defendant] in the position it would have occupied if the breach of confidence had not occurred prior to the public disclosure, ..." *Id.* at 142.

Lamb–Weston alleged that without the worldwide injunction it will be irreparably harmed because its novel french fries are important in creating a niche for its products. According to Lamb–Weston, this novelty will enable it to compete more effectively with McCain, which apparently has a more established distribution system. Allowing McCain to sell the french fries at all will permit it to profit from its head start and to shut Lamb–Weston out of new markets it is trying to reach.

The geographic scope of the injunction was not an abuse of discretion.

## IV

McCain argues that the court erred by failing to make specific findings about the length of its alleged head start. McCain also contends the injunction was an abuse of discretion because it is too long.

### A

■ The court made no explicit findings about how long it would have taken McCain to develop independently its helical blade. It simply imposed an eight-month injunction for McCain's head start without explaining its method of calculation. McCain asserts that this violates Federal Rule of Civil Procedure 52(a), which requires that the court specify its findings of fact and conclusions of law. *See Atari Games Corp. v. Nintendo Inc.*, 897 F.2d 1572, 1578 (Fed.Cir.1990) (applying Ninth Circuit law).

The court indicated that the eight-month duration corresponded to McCain's head start. Although we encourage district courts to make more specific findings of fact, we conclude that the statement here was sufficient for the purposes of Rule 52(a).

### B

■ "[T]he appropriate duration for the injunction should be the period of time it would have taken [the defendant], either by reverse engineering or by independent development, to develop [the product] legitimately without use of [plaintiff's] trade secrets." *K2 Ski Co. v. Head Ski Co.*, 506 F.2d 471, 474 (9th Cir.1974). *Cf. Surgidev Corp. v. Eye Technology, Inc.*, 828 F.2d 452, 457 (8th Cir.1987) (injunction is war-

ranted to insure defendants are not unjustly enriched by their misappropriation); *Premier Indus. Corp. v. Texas Indus. Fastener Co.*, 450 F.2d 444, 448 (5th Cir.1971) (a court has equitable powers to enjoin defendants for a time beyond the expiration of covenants not to compete to effectuate relief for the time they violated the covenants).

 McCain argues that April 19, 1990 is the only date for which there is evidence of misappropriation and that at most it had a one-year advantage beginning on that date. It asserts that with a one-year head start, the injunction imposed on March 27, 1991, should have ended on April 19, 1991, one year from the misappropriation date.

If we were to accept McCain's argument that the misappropriation was April 19 and the head start should be calculated from that date, *see A.L. Laboratories, Inc. v. Philips Roxane*, 803 F.2d 378, 385 (8th Cir.1986), *cert. denied*, 481 U.S. 1007, 107 S.Ct. 1632, 95 L.Ed.2d 206 (1987), the injunction imposed was not an abuse of discretion simply because it ended a year and seven months after that date. *See Winston Research Corp. v. Minnesota Mining and Mfg.*, 350 F.2d 134, 142–43 (9th Cir. 1965). Lamb–Weston presented testimony that its development time for the materials, dimensions and fabricating process for the blade was about a year and a half. Additional testimony was given about Lamb–Weston's reputation for ingenuity and its development time for the blade design.[4]

We reject McCain's argument that if the misappropriation through Ross occurred on April 19, it had only a 33-day head start because Lamb–Weston's patents were issued May 22. Although the shape of the blade and the slicing process was public on May 22, the specifications, materials and manufacturing process for making the blade were still trade secrets because they were not included in the patent applications.

**4.** McCain's reliance on the comments to section 2 of the Uniform Trade Secrets Act is misplaced. The comments indicate that an injunction would be inappropriate where the misappropri-

Oregon law affords broad protection to trade secrets so public disclosure of the blade shape did not exonerate McCain from previous illegal use of that trade secret or the subsequent illegal use of the remaining trade secrets. Although a defendant may ask the court to vacate an injunction after the trade secret is public, "the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation." 1989 Or.Laws 646.463(1); *Kamin v. Kuhnau*, 232 Or. 139, 157–59, 374 P.2d 912, 921–22 (1962).

The eight-month injunction was not an abuse of discretion.

AFFIRMED.

ator has not taken advantage of the head start or a good-faith competitor has already caught up with the misappropriator. Nothing suggests either is true here.