**FEDERAL TRADE COMMISSION, Plaintiff,**

v.

**JOHN BECK AMAZING PROFITS, LLC et al., Defendants.**

**Case No. 2:09–cv–04719–JHN–CW.**

United States District Court, C.D. California.

Aug. 21, 2012.

Evan Rose, Kenneth H. Abbe, Matthew D. Gold, Federal Trade Commission, San Francisco, CA, John David Jacobs, Stacy Rene Procter, Christina Victoria Tusan, Federal Trade Commission, Los Angeles, CA, for Plaintiff.

David Robert Gabor, Judith L. Meadow, Larry C. Russ, Michael S. Brophy, Russ August & Kabat, Los Angeles, CA, for Defendants.

## ORDER RE: SCOPE OF THE INJUNCTIVE RELIEF AND AMOUNT OF MONETARY RELIEF [591]

JACQUELINE H. NGUYEN [*], Circuit Judge.

## I. INTRODUCTION

The Court previously granted Plaintiff Federal Trade Commission's (the FTC) Motion for Summary Judgment (MSJ)

---

[*] Circuit Judge, U.S. Court of Appeals for the Ninth Circuit, sitting by designation. From December 16, 2009 to May 14, 2012, Judge Nguyen presided over this case as a United States District Judge.

against *all* defendants in this action, namely: Family Products, LLC (FP), the company that advertised and sold the wealth-creation products at issue in this action, i.e., the John Beck's Free and Clear Real Estate System (the John Beck System), John Alexander's Real Estate Riches in 14 Days System (the John Alexander System), and Jeff Paul's Shortcuts to Internet Millions (the Jeff Paul System); Mentoring of America, LLC (MOA), the company that sold the coaching programs; Gary Hewitt (Hewitt) and Douglas Gravink (Gravink), FP and MOA's founders and owners; John Beck, John Alexander, and Jeff Paul, the gurus; and John Beck Amazing Profits, LLC (JBAP), Jeff Paul, LLC; and John Alexander, LLC (collectively, Defendants). (Docket No. 591.) However, the Court deferred entry of final judgment, noting that the parties' briefings were inadequate to assist the Court in fashioning the appropriate injunctive and monetary reliefs. The Court ordered the parties to file supplemental briefing on the scope and duration of the injunctive relief as well as the amount of monetary award against each defendant. (Docket No. 591 at 50, 53.) The parties have submitted their supplemental briefs, and the Court hereby addresses the issues raised by the parties below.

## II. INJUNCTIVE RELIEF

### A. Lifetime Ban Against Gravink, Hewitt, FP, and MOA

The FTC seeks to enjoin permanently Defendants Gravink, Hewitt, and FP from engaging or participating in the production or dissemination of any **infomercial,** and also from **assisting others** engaged in the production or dissemination of any infomercial. (Docket No. 598–1 at 9.) (Emphasis in the original.) The FTC posits that a lifetime ban is necessary in view of Hewitt, Gravink, and FP's significant involvement in the creation of the misleading infomercials; the amount of consumer injury involved in this case; the prior lawsuits brought against them by the FTC; and their violation of Judge Cooper's Preliminary Injunction (PI) Order. (Docket No. 613 at 7–8.) [1] Additionally, the FTC seeks to permanently enjoin Gravink, Hewitt, FP, and MOA from engaging or participating in **telemarketing,** and from **assisting others** engaged in telemarketing. (Docket No. 598–1 at 9.) (Emphasis in the original.) The FTC claims that such injunctive relief is necessary based on the following factors: their violations of Judge Cooper's PI Order; their repeated troubles with the Utah Attorney General's Department of Consumer Protection (UDCP); the magnitude of consumer injury that Defendants' telemarketing-related violations caused in this case; the length of time over which they engaged in their unlawful conduct; and their degree of scienter and participation in, and control over, the deceptive conduct. (Docket No. 613 at 3.)

In response, Gravink and Hewitt lodged an Alternative Proposed Injunction, suggesting modifications that significantly limit the scope of the FTC's proposed permanent injunctive relief. (Docket No. 603–2.)

---

1. Defendants' alleged violation of Judge Cooper's Preliminary Injunction Order is the subject of the FTC's Motion for Order to Show Cause (OSC) re Contempt of Preliminary Injunction. (Docket Kos. 283, 327.) On July 21, 2011, the Court granted the motion, finding that the FTC has presented clear and convincing evidence to support its claim that Paul, FP, MOA, Gravink, and Hewitt violated sections II and III of the PI. (Docket No. 327 at 7.) Accordingly, the Court gave these defendants an opportunity to file a supplemental briefing to show why they were unable to comply. The Court also permitted the FTC to file a reply. (*Id.*) On November 28, 2011, the Court heard oral argument on this issue. (Docket No. 585.) The merits of the parties' arguments in connection with the contempt proceeding is addressed in a separate order. (Docket No. 638.)

For example, with respect to the ban on infomercials, Gravink and Hewitt suggest that instead of permanently enjoining them from engaging in *any* infomercial, a less-restrictive relief—one that will permanently restrain them from participating in infomercials featuring the sale of books or other materials relating to the subject of how to make money through turnkey Internet website businesses or how to make money purchasing homes through government tax sale—will be more appropriate. (*Id.* at 7.) Gravink and Hewitt concede that a permanent injunction preventing them from being employed by others who are engaged in the dissemination of infomercials *relating to the wealth-creation products at issue* would be appropriate. Gravink and Hewitt also do not oppose any injunction prohibiting them from owning, producing, or disseminating *any* infomercial, *regardless* of the subject matter, provided that such injunction is limited to only two years. (*Id.*) (emphasis added). Likewise, they do not oppose an injunction preventing them from serving as an officer, director, or manager of any infomercial company, provided that such ban is limited to only two years.

With respect to the ban on telemarketing, Gravink and Hewitt do not appear to oppose an order permanently restraining them from owning, operating, or serving as officers or directors of any non-public company that engages in telemarketing products or services targeting consumers. (*Id.* at 8.) However, Gravink and Hewitt oppose any injunction that will prevent them from owning and operating business-to-business telemarketing companies.

In fashioning the scope of injunctive relief in this case, the Court faces two critical inquiries: (1) what is the appropriate fencing-in relief under the circumstances of this case, and (2) how long should such relief be enforced? The Court addresses these issues in turn.

### 1. Legal Standard

■■■■ Courts enjoy broad discretion in fashioning suitable relief and defining the terms of a permanent injunction. *Church of the Holy Light of the Queen v. Holder,* 443 Fed.Appx. 302, 303 (9th Cir.2011) (citing *Lamb–Weston, Inc. v. McCain Foods, Ltd.,* 941 F.2d 970, 974 (9th Cir.1991)). Nonetheless, [t]here are limitations on this discretion; an injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled. *Orantes–Hernandez v. Thornburgh,* 919 F.2d 549, 558 (9th Cir.1990) (citation omitted); *Lamb–Weston,* 941 F.2d at 974 (Injunctive relief ... must be tailored to remedy the specific harm alleged.); *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1140 (9th Cir.2009) (same). An overbroad injunction is an abuse of discretion. *Stormans,* 586 F.3d at 1140.

■■■ The Federal Trade Commission Act (FTCA) authorizes imposition of comprehensive prophylactic injunctive relief. *FTC v. Dinamica Financiera LLC,* 2010 U.S. Dist. LEXIS 88000, at *49 (C.D.Cal. Aug. 19, 2010); *Litton Indus., Inc. v. FTC,* 676 F.2d 364, 370 (9th Cir.1982) (acknowledging that fencing-in provisions are prophylactic). As the Supreme Court admonishes, those caught violating the [FTCA] must expect some fencing in. *FTC v. Nat'l Lead Co.,* 352 U.S. 419, 431, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957), In some instances, fencing in provisions are necessary to prevent similar and related violations from occurring in the future. *Trans World Accounts, Inc. v. FTC,* 594 F.2d 212, 215 (9th Cir.1979); *FTC v. Think Achievement Corp.,* 144 F.Supp.2d 1013, 1017 (N.D.Ind. 2000) (explaining that reasonable fencing-in provisions are appropriate to prevent illegal practices). Accordingly, courts have routinely imposed some form of fencing in, barring violators from participating in certain lines of business or forms of marketing. *See e.g., FTC v. Gill,* 265 F.3d

944, 957–58 (9th Cir.2001) (affirming the district court's order to permanently prohibit defendants from engaging in the credit repair business in light of their repeated and continuous violation of the district court's preliminary injunction and the likelihood of future violations); *FTC v. J.K. Publ'ns, Inc.*, 99 F.Supp.2d 1176, 1209 (C.D.Cal.2000) (granting a ten-year ban against owning, controlling, holding a managerial position, consulting for, or serving as an officer in any business that handles consumers' credit card or debit card accounts) (citation omitted).[2]

 The framing of the scope of the injunction depends upon the circumstances of each case, the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts.., found to have been committed ... in the past. *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 436–437, 61 S.Ct. 693, 85 L.Ed. 930 (1941). Fencing-in provisions must bear a reasonable relation to the unlawful practices found to exist. *Litton*, 676 F.2d at 370 (internal quotation marks omitted); *see also, In re Stouffer Foods Corp.*, 118 F.T.C. 746, 811 (1994). In determining whether the fencing-in order bears a reasonable relationship to the violation, courts look at (1) the seriousness and deliberateness of the violation; (2) fee ease with which the violative claim may be transferred to other products; and (3) whether the respondent has a history of prior violations. *Stouffer*, 118 F.T.C. at 811; *see*

*also, Litton*, 676 F.2d at 370–71 (instructing that among the circumstances which should be considered in evaluating the relation between the fencing in relief and the unlawful practice are (1) defendant's blatant and utter disregard of the law; (2) defendant's history of engaging in unfair trade practices; and (3) the transferability of the technique of deception to an advertising campaign for some other product). In the final analysis, we look to the circumstances as a whole and not to the presence or absence of any single factor. *Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 392 (9th Cir.1982). In preventing illegal practices in the future, the FTC is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past *FTC v. Ruberoid Co.*, 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081 (1952). In carrying out the objectives of the FTCA, the FTC can seek the imposition of relief to close all roads to the prohibited goal. *Id.; see also, Litton*, 676 F.2d at 370.

 With regard to the duration of the injunctive relief, it is well-established that the court's power to grant such relief survives discontinuance of the illegal conduct, and because the purpose is to prevent future violations, injunctive relief is appropriate when there is a cognizable danger of recurrent violation, something more than the mere possibility. *Think Achievement*, 144 F.Supp.2d at 1017 (quoting *United States v. W.T. Grant Co.*, 345

---

**2.** *See also, FTC v. NCH, Inc.*, 1995 U.S. Dist. LEXIS 21096, at *8–9 (D.Nev. Aug. 31, 1995) (permanently banning defendants from engaging, participating in, or assisting others in engaging or participating in, in any manner or in any capacity whatsoever, directly or through any intermediary, in any telephone premium promotion), *aff'd*, 106 F.3d 407 (9th Cir.1997); *Dinamica*, 2010 U.S. Dist. LEXIS 88000, at *48–49 (permanently banning defendants from offering loan modification or

foreclosure relief services given defendants' repeated prior violations). While defendants in these unpublished cases did not oppose the FTC's motion for permanent injunction, the courts, nevertheless, considered the merits of the moving papers rather than deeming defendants' non-opposition as consent to the granting of the injunction. Accordingly, these cases also provide additional support for the fencing-in relief the FTC is seeking in this case.

U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)) (internal quotation marks omitted).

### 2. Discussion

An order permanently enjoining Gravink, Hewitt, FP, and MOA from engaging, participating, or assisting others in telemarketing and the production or dissemination of any infomercial is warranted for the reasons discussed below.

■ *First,* a less-restrictive, product-specific permanent injunction, such as that suggested by Gravink and Hewitt, will not be sufficient to avoid recurring violations in light of Gravink and Hewitt's long history of blatantly disregarding the law. *Litton,* 676 F.2d at 370–71 (stating that among the circumstances which should be considered in evaluating the relation between the permanent injunction order and the unlawful practice are whether the respondents acted in blatant and utter disregard of law and whether they had a history of engaging in unfair trade practices). Indeed, this is not the first consumer fraud case brought against MOA, which is solely owned by FP, which, in turn, is owned and controlled by Gravink and Hewitt.[3] MOA has been charged numerous times for violating consumer protection laws in Utah.[4]

To illustrate, in September 2004, the Division of Consumer Protection in the Utah Department of Commerce (Division) filed an administrative citation against MOA, which was then located in Provo, Utah, for engaging in the telemarketing of the John Beck and Jeff Paul coaching products without obtaining the proper license and for its telemarketers' failure to inform consumers about their three-day right of rescission under Utah law. (Docket No. 18 [Engerman Decl. ¶ 14, Attach. 1].)[5] This administrative case, which had a potential fine of $19,500, ultimately settled with the Division assessing a fine against MOA for $10,000, with $8,000 of that suspended. (*Id.* ¶ 15, Attach.2.)

Thereafter, on August 23, 2005, the Division issued another citation against MOA for its alleged telemarketing of the Jeff Paul coaching product without obtaining the proper license; its telemarketers misrepresentations and failure to inform consumers about their right to cancel; and its failure to file with the state, and provide consumers with, legally required business opportunity disclosures. This citation had a potential fine of $36,500. (*Id.* ¶ 16.) On that same date, the Division also cited MOA. in connection with the telemarketing of the John Beck coaching product The citation allege that MOA was engaging in the telemarketing of the John Beck coaching product without obtaining the proper license; that MOA telemarketers were making misrepresentations; that MOA unlawfully refused to give refunds; and that MOA telemarketers were failing to inform consumers about their right to cancel. The citation had a potential fine of $27,000. (*Id.* ¶ 17.) The Division and MOA again entered into another settlement agreement. (*Id.* ¶ 18, Attach. 5.) A $63,500 fine was assessed against MOA, but $53,000 of the amount was suspended on payment of an administrative assessment of $10,000.

---

**3.** There is no dispute that Gravink and Hewitt own FP, which, in turn, is the sole member of MOA. (Docket Nos. 451 [Hewitt Decl. ¶ 2]; 448 [D. Gravink Decl. ¶ 2].)

**4.** Gravink and Hewitt do not argue, nor is there any indication in the record, that MOA was under the control of any other individual or entity at the time the Division issued the citations against MOA. Indeed, Defendants'

Joint Supplemental brief does not dispute the FTC's contention that Gravink and Hewitt were the bosses of MOA and FP, [who] controlled every aspect of the companies' operations. (Docket No. 613 at 6.)

**5.** Stuart Engerman is an investigator for the Division who handles cases involving telemarketing fraud. (Docket No. 18 [Engerman Decl. ¶ 2].)

(*Id.*) In addition, MOA was required to refund 28 consumers a total of $180,490.99. (*Id.*)

As a result of its failure to comply with Utah law, in April 2006, the Utah Attorney General's Office filed a lawsuit against MOA in a Utah state court, alleging, *inter alia*, that MOA failed to reform its business practices and that MOA telemarketers were misrepresenting its coaching products. (*Id.* 120.) The case ultimately settled with defendants agreeing to pay a $25,000 fine and promised to work with the Division in resolving consumer complaints. (*Id.* ¶ 21, Attach. 7.)

In June 2009, the Division issued another citation against MOA in connection with the telemarketing of the Beck coaching product. (*Id.* ¶ 24, Attach.9.) According to Gravink, that case settled in November 2009, resulting in a fine of $5,000 against MOA and the adoption of the terms of the preliminary injunction issued by Judge Cooper in this action. (Docket No. 448 [Gravink Decl. 19, Exh. 1].)

In addition to MOA's repeated violations of Utah laws in connection with their telemarketing activities, Gravink and Hewitt, as individuals, have also been sued numerous times for disseminating deceptive infomercials relating to other products. For instance, the FTC filed an administrative action, *In re Twin Star Prods., Inc.*, 113 F.T.C. 847, 1990 WL 10012592, 1990 FTC LEXIS 360 (Oct. 2, 1990), against Gravink and his business associates for their involvement with Twin Star Productions. (Gravink Dep. Tr. at 32:10–13.) *Twin Star* involved infomercials on a weight-loss product, the Euro Trym Diet Patch; a hair-loss product, Folipiexx; and an impo-

tence treatment, Y–Bron. (*Id.* at 31:14–24, 32:6–8.) *Twin Star* ultimately settled with Gravink and his co-defendants agreeing to pay $500,000. (*Id.* at 32:23–25.) As part of the settlement, Gravink and his associates agreed to a consent order (*Twin Star* Order) that enjoined them from disseminating or airing any of the infomercials at issue, and from making any types of deceptive and unsubstantiated representations alleged in the complaint in connection with the marketing of the same or substantially similar products. *In re Twin Star*, 1990 WL 10012592, at *7–11, 1990 FTC LEXIS 360, at *17–25. It further prohibited them from *making any unsubstantiated representation regarding the performance, benefits, efficacy, or safety* of any product or service. *Id.* at *10–11, 1990 FTC LEXIS 360 at *24–25.[6]

Despite the *Twin Star* Order's express prohibition against unsubstantiated claims, in 2005, Gravink, and his partner, Hewitt, were named as defendants in another FTC case in connection with an infomercial for Ab Energizer. (Docket No. 558 [Gravink Dep. Tr. at 29:12–18].) That case ultimately settled with Gravink and Hewitt agreeing to pay $120,000. (*Id.* at 30:25.) In light of MOA, Gravink, and Hewitt's history of prior violations, a less-restrictive, a product-specific permanent injunction is unlikely to deter them from committing future violations.

 *Second*, Gravink and Hewitt's technique of deception could be transferred easily to an advertising campaign for some other product. *Litton*, 676 F.2d at 371. As evidenced by their prior violations, Gravink, Hewitt, and MOA are able

---

**6.** Gravink claims that he had no involvement in the production of, and statements made, in the infomercials at issue in *Twin Star*, (Docket No. 448 [D. Gravink Decl. ¶ 17].) Gravink claims that he was merely a minority shareholder of Twin Star Productions with no man-

agement control over the production and statements made in the infomercials. (*Id.*) This fact notwithstanding, Gravink's involvement in the *Twin Star* case is relevant to the history of prior violations analysis.

to make deceptive infomercial claims for any type of product, from hair-loss product to wealth-creation products. Likewise, Gravink and Hewitt's deceptive telemarketing practices could be applied to any product.

■ *Third,* Gravink and Hewitt's violations of the FTCA and the Telemarketing Sales Rule (TSR) are serious, pervasive, and continuous. The amount of consumer injury is massive, involving an estimated loss of nearly $500 million dollars[7] and almost one million customers.[8]

■ *Fourth,* Gravink and Hewitt's personal involvement in the violations were extensive and highly deliberate. They authored and approved the deceptive claims and continued to engage in improper practices even in the face of consent decrees and court orders. They also continued to violate the FTCA and the TSR even as this litigation was pending by violating Judge Cooper's preliminary injunction order.

Considering all the above circumstances, the Court believes that a less restrictive injunctive relief will be ineffective. Therefore, the Court finds that an order permanently enjoining Gravink, Hewitt, FP, and MOA from engaging, participating, or assisting others in telemarketing and the production or dissemination of any infomercial is warranted.[9]

Gravink and Hewitt object to the FTC's Proposed Final Judgment on the ground that the terms of the lifetime ban on infomercials and telemarketing are overbroad. They argue that prohibiting them from assisting others who are engaged in infomercials or telemarketing would cut off any way for [them] to be gainfully employed. (Docket No. 603 at 6.) Further, they argue that a complete permanent ban is not reasonably tailored and prohibits too many activities that are not implicated by this litigation. (*Id.* at 8.)

The Court recognizes that the injunction is broad, but believes that it is reasonably tailored to the violation and is necessary to prevent future violations. injunctions barring defendants from assisting others who are involved in the same line of business have been routinely adopted and issued. *See e.g., Think Achievement,* 144 F.Supp.2d at 1024 (enjoining defendants from assisting others who are engaged in the business of telemarketing or the business of marketing career advisory goods or services); *NCH,* 1995 U.S. Dist. LEXIS 21096, at *8–9 (permanently enjoining defendants from assisting others in engaging or participating; in … any telephone premium promotion); *Dinamica,* 2010 U.S. Dist. LEXIS 88000 at *59 (permanently enjoining defendants from assisting others engaged in advertising, marketing, promoting, offering for sale, or selling any mortgage loan modification or foreclosure relief service). An order allowing Gravink and Hewitt to be employed by others who are engaged in telemarketing and dissemination of infomercials will only give them

---

7. Docket No. 615 [Evan Rose Decl. ¶ 21].

8. Docket No. 376 [Conrey Decl., Attach. 1, App. D at D–4].

9. Occupational bans, such as the one at issue here, have been upheld in this Circuit. For example, in *FTC v. Gill,* the Ninth Circuit affirmed a district court order prohibiting the defendant from engaging in the credit repair business. 265 F.3d at 957. The Ninth Circuit approved the district court's finding that a less restrictive injunction would be inadequate given the systematic nature of defendant's misrepresentations and continued violation of the terms of the district court's preliminary injunction order. *Id. Gill* held that because defendant ignored and violated the preliminary injunction order, there was no basis for disturbing the district court's prudent assessment that giving Defendants another chance might prove to be unwise. *Id.*

another opportunity to continue violating consumer protection laws.

Gravink and Hewitt's reliance on *J.K. Publications* is misplaced. 99 F.Supp.2d 1176. In that case, the court rejected the FTC's proposed injunction barring defendant from being employed as a non-managerial employee in any business that handles credit cards or debit cards. *Id.* at 1210. The court reasoned that this ban effectively prohibits defendant from working in the overwhelming majority of businesses *Id.* Unlike the case in *J.K. Publications*, the proposed bans here permit Gravink and Hewitt to be employed by any business so long as Gravink and Hewitt are not providing assistance in telemarketing or the production and dissemination of infomercials. Accordingly, *J.K Publications* is distinguishable.

Gravink and Hewitt also object to the duration of the injunction, claiming that an outright ban of two years—as opposed to the lifetime ban suggested by the FTCis more appropriate. This argument is insupportable given Gravink and Hewitt's history of repeated violations.

## B. Other Injunctive Relief
### 1. Compliance Reporting and Record Keeping

The FTC's Proposed Final Judgment would require defendants in this action, for a period of twenty years, to obtain acknowledgments of receipt of the Final Judgment from people they work with, to submit compliance reports to the FTC, and to keep specified business records. (Docket No. 598 at 25–29.) Defendants do not object to these requirements. However, they seek to limit them to five years for Hewitt and Gravink, and two years for the gurus. Defendants have not explained why these provisions are unduly burdensome. Because of Hewitt and Gravink's long history of prior violations, the Court finds that a twenty-year period pro-

posed by the FTC is justified. Because the gurus do not have the same history as Gravink and Hewitt, a ten-year period is sufficient.

### 2. Destruction of Customer Records

The FTC's Proposed Final Judgment seeks to permanently enjoin Defendants, their officers, agents, servants, employees, attorneys, and other associates from disclosing, using, or benefitting from customer information of any person that was obtained by any Defendant prior to the entry of the final judgment. In addition, the FTC seeks an order requiring Defendants to destroy such information within thirty days. (*Id.* at 22–23.) These terms are common in final orders in FTC cases. *See e.g., FTC v. Navestad*, 2012 U.S. Dist. LEXIS 40197, at *24–25 (W.D.N.Y. Mar. 23, 2012); *Think Achievement*, 144 F.Supp.2d at 1024. The FTC notes that destruction of customer records is necessary to prevent Defendants from engaging in future scams or from selling such information to third-parties. (Docket No. 609 at 14.)

Defendants seek to modify the FTC's Proposed Final Judgment to require only the destruction of customer information derived by Defendants from the infomercials, products, or services at issue. (Docket Mo. 603 at 14.) Defendants ask that customer information derived from other business activities of Defendants that are not at issue should not be destroyed. (*Id.*)

Defendants are engaged in the business of telemarketing and production and dissemination of infomercials. While Defendants claim they have customer information derived from other business activities, they have failed to proffer any evidence demonstrating that they are involved in any other business ventures aside from telemarketing and production or dissemination of infomercials. In light of the

terms of the injunctive relief, as they apply to the Gravink, Hewitt, the gurus, and the corporate entities, none of the Defendants have any legitimate reason for maintaining customer records. Accordingly, the Court declines to adopt Defendants' suggested modifications.

## III. EQUITABLE MONETARY RELIEF

The FTC seeks a monetary award in the sum of $478,919,765, the total *net* revenue figure for kit sales, coaching sales, and two years of continuity sales. (Docket Nos. 613 at 15; 615 [Rose Decl. ¶ 21].) [10] This amount does not reflect any reduction to account for any monies earned by customers who used Defendants' products. (Docket No. 613 at 14–15.) This amount also does not include net revenue attributable to continuity program sales for the years 2006 and 2007 because Defendants do not have records of the amount of continuity revenues for those years. (Docket No. 615 [Rose Decl. ¶ 21].) The $478,919,765 amount is based on the following figures;

| DEFENDANTS TO BE HELD LIABLE | BASIS FOR DAMAGES | AMOUNT OF MONETARY RELIEF |
|---|---|---|
| Beck, Gravink, Hewitt, and corporate defendants, jointly and severally | Count 1 (*net* revenue for sales of Beck kits) [11] | $ 113,374,305 [12] |
| Alexander, Gravink, Hewitt, and corporate defendants, jointly and severally | Claim 3 (*net* revenue for sales of Alexander kits) | $ 11,664,940 [13] |
| Paul, Gravink, Hewitt, and corporate defendants, jointly and severally | Claim 5 (*net* revenue for sales of Paul kits) | $ 33,803,337 [14] |
| Gravink, Hewitt, and corporate defendants, jointly and severally | Claims 2, 4, 6 (*gross* revenue for sales of continuity programs) | $ 40,009,648 [15] |
| Gravink, Hewitt, and corporate defendants, jointly and severally | Claim 7 (*net* revenue for sales of the coaching services) [16] | $ 280,067,535 [17] |
| TOTAL *NET* REVENUE FOR KIT AND COACHING SALES FOR 2006 TO 2010 AND TOTAL *GROSS* REVENUE FOR CONTINUITY SALES FOR YEARS 2008 TO 2009 [18] | | $ 478,919,765 |

10. The Rose Supplemental Declaration, docket no. 615, which was filed in support of the restitutionary damages sought by the FTC, relies on certain exhibits that are authenticated in the declaration made by John D. Jacobs, counsel for the FTC, in support of the FTC's supplemental briefing, docket no. 614, and the declaration filed by Rose in support of the FTC's MSJ, docket no. 538. The summaries contained in Attachments A and C to the Rose Supplemental Declaration are based on the information contained in Attachment B, a letter from Defendants' counsel to Mr. Jacobs.

11. The FTC calculated the total *net* revenue for sales of the kits by subtracting the refunds and chargebacks from Defendants' *gross* revenues. (Docket No. 615 [Rose Decl. ¶ 8].)

12. Docket No. 615 [Rose Decl. ¶ 8].

13. Docket No. 615 [Rose Decl. ¶ 12].

14. Docket No. 615 [Rose Decl. ¶ 10].

15. Docket No. 615 [Rose Decl. ¶ 17].

16. The FTC calculated the total net revenue for sales of the coaching services by subtracting the refunds, chargebacks, and tuition reimbursements from Defendants' gross revenues.

17. Docket No. 615 [Rose Decl. ¶ 14].

18. According to Defendants, records of refunds and chargebacks for continuity program sales were not kept separately. Instead, they were included in the refund and chargeback figures for kit sales. (Docket No, 615 [Rose Decl. ¶ 18]. Attach. B) (Letter from

(Docket No. 613 at 14–15.)

The FTCA provides [t]hat in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. 15 U.S.C. § 53(b). This provision gives the federal courts broad authority to fashion appropriate remedies for violations of the Act. *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir.1994). This authority includes the power to grant any ancillary relief necessary to accomplish complete justice, including the power to order restitution. *Id.* In the absence of proof of actual damages, courts may use the amounts consumers paid as the basis for the amount defendants should be ordered to pay for their wrongdoing. *Gill*, 265 F.3d at 958.

Here, in addition to the refund amounts that the FTC has already deducted from gross revenues, Defendants ask the Court to subtract from the total amount of restitutionary damages: (1) monies attributable to consumers who benefitted from the programs and (2) benefit of actual services rendered to avoid providing consumer windfalls. (Docket No. 603 at 14.) The FTC calculates this offset to be approximately $5.6 million, (Docket No. 613 at 10.) Because the total monetary relief sought by the FTC is based on raw data produced by Defendants to the FTC, i.e., Attachments A and B to the Rose Supplemental Declaration, *none of the Defendants* challenge the underlying data used by the FTC in calculating the damages. Nor do Defendants challenge the FTC's formula for obtaining the total *net* revenue, i.e., *gross* revenue minus refund

and chargeback.[19] Rather, Defendants merely ask the Court to subtract $5.6 million from the total monetary award. (Docket No. 603 at 15.)

The FTC counters that no offset is warranted. (*Id.*) Instead, the FTC argues that [t]he corporate defendants, who were in privity with consumers and received the proceeds of all sales, should ... be required to disgorge the entire amount of gross revenues less refunds, and [t]hey should not receive any credit that is based on any benefit that consumers might ultimately have derived after they were misled. (*Id.* at 11–12.)

"Disgorgement is designed to deprive a wrongdoer of unjust enrichment. *FTC v. Neovi, Inc.*, 2009 U.S. Dist. LEXIS 649, at *29 (S.D.Cal. Jan. 7, 2009) (quoting *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113–14 (9th Cir.2006)). Disgorgement includes all gains flowing from the illegal activities." *Neovi*, 2009 U.S. Dist. LEXIS 649, at *29 (citation omitted). Because Defendants' gains flow from their deceptive activities, the Court agrees with the FTC that Defendants' liability should not be reduced to account for consumers who received some form of benefit. (Docket No. 613 at 11.) Whether the consumer is lucky enough to make a profit or some small amount of money from applying what he learned from Defendants' products is irrelevant to the issue of whether Defendants' representations were deceptive and misleading.

Defendants' Supplemental Brief failed to cite any authority in support of their claim that the total revenue subject to disgorge-

---

Defendants' Counsel Judith Meadow to Plaintiff's Counsel John Jacobs, dated Apr, 5, 2012.) Consequently, it is neither possible nor necessary to generate a separate total net revenue figure—total gross revenue less refunds and chargebacks—for sales of the continuity programs. (*Id.*)

19. The $478,919,765 grand total sought by the FTC is based on the FTC's application of its formula to the raw data produced by Defendants during discovery. (Docket No. 615 [Rose Decl. ¶¶ 8, 10, 12, 14, 17]; *see also,* Attach. B.)

ment should be reduced by the money the consumers made. (*See* Docket No. 603 at 14–15.) However, in their Opposition to the FTC's motion for summary judgment, Defendants cite *FTC v. Zamani* for the proposition that it is error to simply conclude that the 'total amount paid by consumers' constitutes the defendant's unjust enrichment without accounting for refunds and actual services rendered. 2011 U.S. Dist. LEXIS 60913, at *38 (CD.Cal. June 6, 2011) (citation omitted). While this general proposition is correct, the FTC here has already subtracted the refunds, chargebacks, and tuition reimbursements from the $478,919,765 amount consistent with *Zamani*. Further, in contrast to *Zamani*, where the defendants promised to perform some *services*, the Defendants here promised certain *outcomes* that turned out to be unsubstantiated. While the positive results in *Zamani* were obtained in part through the services rendered by the defendants, thereby warranting credit for actual services rendered, whatever positive results achieved by the consumers here flow from the consumers' own efforts. (Docket No. 613 at 12–13.) Accordingly, *Zamani* is distinguishable.

## IV. OTHER REQUESTS

### A. 10–day Request for Payment

The FTC asks that the judgment be paid within ten days of entry of this Order. (Docket No. 598 at 23–25.) Defendants object to this payment window, claiming that it is ruinous. (Docket No, 603 at 14.) However, Defendants do not offer any alternative payment window. Instead, they summarily submit without any factual support that they cannot pay such a judgment. (*Id.*) The Court finds that a thirty-day payment window is reasonable.

### B. Request for Stay Pending Appeal

Defendants ask that the permanent ban on infomercial and telemarketing be stayed pending appeal should Defendants file a Notice of Appeal within twenty days of this order. (*Id.* at 15.) Although the parties have not fully briefed this issue, the Court sees no reason to stay its order. Accordingly, this request is **DENIED**.

## V. CONCLUSION

For the reasons discussed above, the Court adopts the FTC's Proposed Final Judgment with modifications. Judgment shall issue.

**IT IS SO ORDERED.**