FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
*Plaintiff-Appellee*,

v.

GRANT CONNECT, LLC, et al.,
*Defendants*,

and

KYLE R. KIMOTO,
*Defendant-Appellant*.

No. 11-18023

D.C. No.
2:09-cv-01349-
PMP-RJJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, Senior District Judge, Presiding

Argued and Submitted
April 7, 2014—Pasadena, California

Filed August 15, 2014

Before: Sidney R. Thomas, Milan D. Smith, Jr.,
and Morgan Christen, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

# SUMMARY[*]

## Federal Trade Commission

The panel affirmed in part and vacated in part the district court's summary judgment in favor of the Federal Trade Commission, and its order permanently enjoining Kyle Kimoto from engaging in a variety of marketing tactics and ordering him to pay restitution.

The district court found that Vertek, Kimoto's wholly controlled company, had committed multiple violations of the Federal Trade Commission Act, through its misleading advertising and various marketing schemes.

The panel held that the district court properly held Kimoto personally liable for both injunctive relief and the requirement to pay restitution with respect to Vertek's Line of Credit Scheme, Grant Connect Scheme, and Work From Home Scheme. The panel also held that Kimoto could not be held liable for either injunctive relief or restitution with respect to the Acai Total Burn Scheme. The panel vacated that part of the district court's grant of summary judgment and permanent injunction based on Vertek's violations of the FTC Act in connection with the Acai Total Burn Scheme.

The panel held that individual liability for corporate malfeasance was available for violations of the Electronic Fund Transfer Act because such violations are also deemed to be violations of the FTC Act, and that Kimoto was liable

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

for Vertek's violations of the Electronic Fund Transfer Act because of his personal involvement in concocting and carrying out the several schemes that violated the Act.

The panel held that the scope of the district court's permanent injunction was not overbroad. The panel remanded so that the district court could modify the permanent injunction and the amount of restitution as required by this decision.

## COUNSEL

Peter Borenstein (argued) and Michael Dirscoll (argued), Law Students, University of Loyola Law School, Los Angeles, California;(argued); Erica L. Reilley, Jones Day, Los Angeles, California; Daniel Patrick Selmi, Los Angeles, California, for Defendant-Appellant.

Theodore P. Metzler (argued), Burke W. Kappler, and Dotan Weinman, Attorneys; Roberto Anguizola, Assistant Director; John F. Daly, Deputy General Counsel for Litigation; Federal Trade Commission, Washington, D.C.; Blaine T. Welsh, Assistant United States Attorney, Las Vegas, Nevada, for Plaintiffs-Appellees.

**OPINION**

M. SMITH, Circuit Judge:

Kyle Kimoto (Kimoto) appeals from the district court's grant of summary judgment to the Federal Trade Commission (FTC), and its order permanently enjoining Kimoto from engaging in a variety of marketing tactics, and ordering him to pay restitution. The district court found that Vertek—Kimoto's wholly controlled company—had committed multiple violations of the FTC Act, 15 U.S.C. §§ 41–58, through its misleading advertising, and further found that Kimoto was both personally involved in the practices and knew that the advertising was misleading or was recklessly indifferent as to that possibility. On this basis the district court permanently enjoined Kimoto personally from engaging in a variety of advertising practices and ordered him to pay restitution.

On appeal, Kimoto argues that the FTC presented insufficient evidence of his involvement in Vertek's violations of the FTC Act to personally enjoin him or require him to pay restitution. Specifically, Kimoto argues that he cannot be held liable for Vertek's schemes related to the marketing of what are styled the Line of Credit scheme, the Grant Connect scheme, the Work From Home scheme, and the Acai Total Burn scheme, because the campaigns were not launched until after Kimoto was imprisoned as a result of prior violations of the FTC Act committed through a different company. Kimoto further argues that he cannot be individually liable for Vertek's misdeeds under the Electronic Fund Transfer Act (EFTA), codified in part at 15 U.S.C. § 1693. Finally, Kimoto claims that the district court's injunction—barring him from engaging in what are described

as negative-option marketing, continuity programs, preauthorized electronic fund transfers, the use of testimonials, and marketing or selling products related to grants, credit, business opportunities, diet supplements, or nutraceuticals—is overly broad.

We affirm the district court's grant of summary judgment to the FTC in part, and vacate the district court's grant of summary judgment to the FTC solely with respect to the Acai Total Burn scheme.

**FACTUAL AND PROCEDURAL BACKGROUND**

Kimoto's fraudulent business practices have drawn FTC scrutiny for over a decade, and have resulted in three distinct enforcement actions against him. Kimoto's various schemes have employed several unifying features: in each, Kimoto lured consumers with a deceptively advertised headline product, and then enrolled them in "upsells," or negative-option "free trials" that required consumers to undergo a burdensome cancellation process in order to avoid inadequately disclosed recurring monthly fees.

Two such schemes provide the relevant background for this appeal. In 2003, the FTC brought an enforcement action against Kimoto and one of his companies, Assail, Inc. *FTC v. Assail, Inc.*, 410 F.3d 256, 259 n.1 (5th Cir. 2005). The FTC alleged that Kimoto enticed customers with an offer to purchase a preapproved MasterCard through Assail, but that when they tried to do so Assail provided them either with applications for cash-secured debit cards, or with unusable plastic cards bearing an unauthorized reproduction of the MasterCard logo. *Id.* When customers accepted the offer for the ostensible credit cards, Assail also enrolled them in

additional negative-option "free trials" that ceased to be free after an introductory period. *Id.* Assail then charged consumers recurring fees both for the "credit cards" and for the "free trials," and erected a variety of barriers to effective cancellation. *Id.* On appeal, the Fifth Circuit held that Kimoto, through Assail, "committed multiple, egregious violations of the [FTC Act]." *Id.* at 264. The district court in *Assail* imposed a permanent injunction barring Kimoto from engaging in telemarketing and also ordered Kimoto to pay $106 million in restitution. Subsequently, the FTC initiated criminal charges against Kimoto for his role in the Assail scheme. *United States v. Kimoto*, 588 F.3d 464, 470 (7th Cir. 2009).

Apparently undeterred by the injunction, Kimoto moved to Las Vegas and formed a corporate entity to engage in Internet marketing schemes, which eventually became the Vertek Group, LLC. To avoid regulatory scrutiny, Kimoto entrusted his then-wife, Juliette Kimoto, with legal ownership of the entity. According to Kimoto's ex-wife, this structure had the added—and intended—benefit of permitting her to profit from the company in the event that Kimoto was incarcerated.

Although Mrs. Kimoto was the titular owner of Vertek, Kimoto organized and ran the company. Kimoto hired many of the employees who had been involved in the Assail scheme, including Michael Henriksen and Tasha Jn Paul. Kimoto also arranged for Michael Henriksen's brother's business, Global Gold, to be the first "product provider" for the scheme and recruited two more Assail veterans, Randy O'Connell and James Gray—through their business consulting and staffing company O'Connell Gray, LLP—to help "with the logistics of accepting transactions on the

[Internet] . . . ." With his team in place, Kimoto directed and participated in the development of several deceptive marketing campaigns.

## A. The Line of Credit Scheme

One of Vertek's first schemes involved the marketing of a "$7,500 Unsecured Credit Line" with promises such as "No Credit Check! No Employment Verification! No Security Deposit! Bankruptcy? No problem! Approval Guaranteed!" The advertisements failed to mention that consumers could only use the "line of credit" to make purchases from Global Gold's online store.[1] Consumers who clicked on the advertisements would be taken to so-called "landing pages," which were deceptive websites where consumers could sign up for the scheme. Consumers entered personal data on two screens, which contained check boxes indicating that the customers agreed to certain terms and conditions, as well as a privacy policy.

A section entitled "Offer Details" appeared in small print further down the page, below the "Submit" button. The details stated that customers would be charged a $39.95 monthly fee if they did not cancel the service, and that they would be automatically signed up for additional programs, each of which had its own "free trial" period, followed by recurring monthly charges.

The terms and conditions suggested that consumers would receive a traditional credit card. Hidden deep in the fine print, however, the terms and conditions noted that the line of

---

[1] Vertek marketed the same scheme under numerous brands, including Global Gold, First Plus Platinum, and First National Gold.

credit could only be used "to purchase merchandise exclusively at the Global Gold Credit Services Web site." The terms and conditions also noted, more than twenty paragraphs into the fine print that the consumer "accepted enrollment for up to 2 additional promotional product offers . . . ."

Consumers who signed up for the line of credit often believed that they would receive a credit card, and also complained that they never agreed to be charged for the "upsells." When consumers tried to cancel, Global Gold's customer service operation made it exceedingly difficult, needlessly transferring customers to different websites or phone numbers, even though all of the calls ended up in the same service center. The scheme ran from June 2007 until May 2009, when the FTC shut it down. During that time, after considerable effort on their parts, approximately 94 percent of subscribers cancelled their subscriptions.

## B. The Grant Connect Scheme

Like the Line of Credit scheme, the Grant Connect scheme relied on misleading advertising and hidden "upsells." The Grant Connect landing pages featured pictures of President Obama and Vice President Biden, or of a scantily clad female model holding cash. The pages stated that billions of dollars in government grants were available to individuals "to help [them] with [their] financial situation," including funding home purchases, child care, debt consolidation, medical costs, and other personal expenses. The sites offered an "easy to use program" to "instantly find the Grant that's right for you," and included phony testimonials from individuals claiming that they had received hundreds of thousands of dollars in government grants.

The "landing pages" used the same deceptive two-step ordering process as the Line of Credit scheme. The inconspicuous offer details included an initial $2.78 processing fee along with automatic recurring monthly charges of $39.95, as well as enrollment in two additional offers with their own trial periods and negative-option monthly charges.

Customers who purchased Grant Connect were directed to the Grant Connect website, where they discovered that most government grants cannot be used for personal expenses. Despite this fact, Global Gold representatives (who also handled calls related to the Grant Connect scheme) told users they could find grants for things like expanding a business, buying a home, and other personal expenses. The Grant Connect scheme began in March 2008. By the time the FTC shut down the site in May 2009, and after considerable effort on their parts, more than 91 percent of Grant Connect's customers had cancelled their memberships.

## C. The Work From Home Scheme

The Work From Home scheme operated along similar lines. Misleading advertisements promised that consumers could make a substantial income quickly and easily while working from home. One such program, marketed as Domain Processing or One Hour Wealth Builder, claimed that users could "immediately begin earning hundreds to thousands of dollars a day, in just a few minutes of [their] spare time," through buying and selling expired Internet domain names. Indeed, the site claimed that users could make $174,150 a year working for fewer than four hours a day. A different program, My Search Cash, offered a "free"

trial kit for an "easy to use system" to make "$50,000 or more a year" using eBay and Google.

Not only were these earning claims unsubstantiated, the sites also included false testimonials extolling the simplicity of making money using the systems. The Work From Home scheme used the same two-step ordering process, and also included two "free" negative-option trials. The Work From Home scheme began in March 2008 and continued until the FTC took over the sites in July 2009. By the time the FTC stepped in, after considerable effort on their parts, approximately 63 percent of customers who signed up for the offers had cancelled.

## D.  Kimoto's Trial and Incarceration

Kimoto's criminal trial for his involvement in the Assail scheme began in late March 2008. *Kimoto*, 588 F.3d at 470. After a ten-day trial, the jury convicted Mr. Kimoto on one count of conspiracy, one count of mail fraud, and twelve counts of wire fraud. *Id.* at 468. During his trial and his subsequent incarceration, Kimoto ceased to actively participate in Vertek's daily activities.

## E.  The Acai Total Burn Scheme

The final version of Vertek's scheme involved the marketing of Acai berries, a popular nutritional supplement. Consumers were told that Acai Total Burn would help them build muscle, increase their metabolism, lose weight, gain energy, reduce fatigue, and retard the aging process. These claims were unsubstantiated.

The Acai Total Burn scheme used the same deceptive two page ordering process, inconspicuous disclosures, and automatic enrollment in additional negative-option trials as the other schemes. Acai Total Burn was available to consumers for only two months, from June 5, 2009, through July 30, 2009. During that time, the program enrolled 670 customers, 159 of whom had already cancelled when the FTC took over the site.

## F. Prior Proceedings

In July 2009, the FTC brought suit against many of the participants in the schemes, including Vertek, Global Gold, Steven Henriksen, and Mrs. Kimoto. The FTC sought, among other relief, a temporary restraining order, which the district court granted the following day, and a preliminary injunction. The FTC amended its complaint to add allegations regarding additional iterations of the scheme, as well as to add Kimoto, Michael Henriksen, Tasha Jn Paul, Johnnie Smith, and others as defendants.

Following discovery, the FTC and various defendants moved for summary judgment. The district court found no genuine dispute of material fact regarding whether the Line of Credit, Grant Connect, Work From Home, and Acai Total Burn schemes were deceptively marketed; that the negative-option upsells were inadequately disclosed; that the testimonials were false; and that defendants violated the EFTA by debiting consumers' accounts without written authorization. Kimoto does not challenge these findings on appeal.

The district court also found that the corporate defendants operated as a common enterprise, because "[a]ll the various

offers were run by the same individuals using different company names," the defendants "swapped and shared personnel," as well as "blurred the lines of corporate separateness in their activities," and "engaged in concerted and coordinated action across campaigns, and [making] their profits interdependent." Kimoto, initially proceeding pro se, was the only defendant to appeal from the district court's judgment.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over Kimoto's appeal from the district court's grant of summary judgment and entry of a permanent injunction under 28 U.S.C. § 1291. We review de novo the district court's grant of summary judgment. *FTC v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009). We view the evidence in the light most favorable to the non-moving party and decide whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *Id.* Where the district court chooses to impose an equitable remedy, we review its decision for an abuse of discretion. *Id.* at 931.

## DISCUSSION

Kimoto contends that there is insufficient evidence of his personal involvement in many of the schemes to hold him personally liable. Kimoto further argues that his liability for Vertek's actions ended when he left the company to prepare for his criminal trial, and that he cannot be individually liable for Vertek's misdeeds under the EFTA.

Kimoto also contends that the district court's injunction, which bars him from engaging in negative-option marketing,

continuity programs, preauthorized electronic fund transfers, the use of testimonials, and marketing or selling products related to grants, credit, business opportunities, diet supplements, or nutraceuticals, is overly broad. We address these arguments in turn.

## I.  Personal Liability

Individuals may be held liable for injunctive relief based on corporate entity violations of the FTC Act if (1) the corporation committed misrepresentations of a kind usually relied on by a reasonably prudent person and resulted in consumer injury, and (2) individuals participated directly in the violations or had authority to control the entities. *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170–71 (9th Cir. 1997). In order to hold an individual liable for restitution as a result of the misconduct of a corporation, the FTC must also show that the individual "had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *Id.* at 1171 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)). To satisfy the knowledge requirement, the FTC must show "that [a defendant] 'had actual knowledge of material misrepresentations, [was] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *Id.* The FTC need not show that a defendant intended to defraud consumers in order for that individual to be personally liable. *Id.* And "[t]he extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability." *FTC v. Affordable Media*,

179 F.3d 1228, 1235 (9th Cir. 1999). Applying this standard, we conclude that the district court properly held Kimoto personally liable for both injunctive relief and the requirement to pay restitution with respect to all of the schemes described above, with the exception of the Acai Total Burn scheme.

## A. Line of Credit Scheme

Kimoto does not challenge his individual liability for injunctive relief with respect to the Line of Credit scheme. Further, the government's evidence establishes that Kimoto possessed the requisite scienter to be personally liable for restitution because he either knew that Vertek was engaged in deceptive advertising in connection with the Line of Credit scheme or was recklessly indifferent as to that fact. *Publ'g Clearing House*, 104 F.3d at 1171. Kimoto arranged Vertek's entire operation. He organized the companies, recruited personnel who had been involved in his prior deceptive marketing schemes, and directed Vertek's activities. This alone is enough to conclude that he had knowledge sufficient to support personal liability for restitution damages. *Id.* ("The extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability.").

Additionally, Kimoto declared that he thought it was "important for [him] to understand and know [the language on the deceptive landing pages], because that was [his] job to take it out to the affiliate marketer." In light of Kimoto's prior troubles with the FTC, which also involved inadequately disclosed "upsells," his level of participation in the scheme and knowledge of deceptive web pages shows that he knew about, or was recklessly indifferent as to

Vertek's deceptive practices. *See Publ'g Clearing House*, 104 F.3d at 1171 (holding an individual liable where she filed a business license at the direction of someone facing criminal charges due to deceptive telemarketing, and had worked at a predecessor company that had been shut down due to a fraud investigation); *FTC v. Amy Travel*, 875 F.2d, 564, 574–75 (7th Cir. 1989) (holding individuals liable where they wrote deceptive scripts and managed the day-to-day activities of the corporation).

Kimoto argues that the FTC has not established the requisite scienter because he sought the advice of counsel, and was imprisoned at the time Vertek received many of the consumer complaints and chargebacks related to Global Gold. Kimoto is mistaken on both counts. It is well established that "reliance on advice of counsel [is] not a valid defense on the question of knowledge" required for individual liability. *FTC v. Cyberspace.Com*, *LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006) (quoting *Amy Travel*, 875 F.2d at 575). Nor is it relevant that many of the consumer complaints and chargebacks—which can constitute evidence of an individual's knowledge—were received after Kimoto was incarcerated. As previously discussed, Kimoto was well aware of the fraudulent nature of the schemes before he was imprisoned. The fact that he did not receive additional information that would have heightened his knowledge of Vertek's FTC Act violations does not absolve him.

## B. Grant Connect Scheme

Kimoto is personally liable for Vertek's false advertising of the Grant Connect scheme because he both controlled Vertek at the time the scheme was organized, and directly participated in establishing the scheme. According to his

fellow con artists, Kimoto was "responsible for creating and organizing Vertek." He "assembled a team to assist him in conducting the business of Vertek . . . , which included Defendants Michael Henriksen and Tasha Jn Paul," and "personally participated in the operation[] of Vertek [] until he began full-time preparation for his criminal trial." "During the time that he participated in the operation[] of Vertek [], [] Kimoto directed the activities of Vertek []." Accordingly, Kimoto controlled Vertek at least until the beginning of his trial in March 2008. In 2007, more than a year before Kimoto's criminal trial, Vertek began drafting deceptive terms and conditions for the scheme, as well as deceptive landing pages and advertisements. Vertek also created the logo for the scheme. Kimoto thus participated in the claimed violations through his control of, and involvement in, Vertek during the period that Vertek drafted the misleading advertising.

Kimoto also personally participated in concocting the Grant Connect scheme. Kimoto introduced his idea for the scheme to O'Connell Gray in 2006, after which James Gray sent Kimoto login credentials for several grant search products in order to enable Tasha Jn Paul to create a "highly detailed roadmap of how all the sites and offers interrelate." Kimoto also negotiated the roles and responsibilities of Vertek and O'Connell Gray with respect to the Grant Connect scheme. Following these discussions, O'Connell Gray sent Kimoto a draft letter of intent regarding the "Government Grant Venture" between O'Connell Gray and a "Kyle Komoto [sic] entity to be named." Finally, in early 2008, Kimoto received the misleading "program specifics" and phony "testimonials" for Grant Connect.

Kimoto argues that he cannot be held liable because Grant Connect was not marketed to consumers until after his imprisonment. Our case law makes clear that an individual is liable for corporate violations of the FTC Act where that individual "participated directly in the violation." *Publ'g Clearing House*, 104 F.3d at 1170. Here, Vertek's violation consisted of the deceptive marketing that underlay the Grant Connect scheme, marketing that Kimoto participated in designing and approving. Kimoto does not allege, nor does the record show, that the marketing materials surrounding Grant Connect materially changed after he ceased his active participation in the scheme. Accordingly, Kimoto is personally liable for Vertek's violations in connection with the Grant Connect scheme because of his personal involvement in that violation—drafting the misleading advertisements that constituted the violation. The fact that Kimoto did not continue his participation after his criminal trial began does not alter the simple fact that he participated in creating the very material found to be misleading by the district court.

Kimoto possessed the requisite scienter to be personally liable for restitution because he either knew that Vertek was engaged in deceptive advertising in connection with the Grant Connect scheme or was recklessly indifferent as to that fact. *Publ'g Clearing House*, 104 F.3d at 1171. Gray sent Kimoto program specifics and testimonials for Grant Connect on February 15, 2008, many months before the product launched. Clearly the testimonials could not have been legitimate since the product had not yet launched. Kimoto thus had knowledge that the scheme was deceptive.

### C.  Work From Home Scheme

Kimoto wrote the deceptive text for the landing pages associated with the Domain Processing scheme, one of the Work From Home schemes, to redesign the website, and to design the landing pages and deceptive advertisements. Kimoto also received the product description for the scheme, which deceptively promised that participants could earn inflated incomes.

Kimoto possessed the requisite scienter to be personally liable for restitution because he either knew that Vertek was engaged in deceptive advertising in connection with the Work From Home scheme or was recklessly indifferent as to that fact, *Publ'g Clearing House*, 104 F.3d at 1171,  for the same reasons that he knew, or was recklessly indifferent as to the possibility that the statements associated with the Line of Credit scheme and Grant Connect scheme were misleading—namely, his history of trouble with the FTC related to "upsells," his orchestration of the enterprise that brought the scheme to fruition, and the clearly overstated incomes contained in the draft product description that he received.

### D.  Acai Total Burn Scheme

Unlike the other schemes previously described, however, the evidence does not show that Kimoto controlled Vertek at the time the Acai Total Burn scheme was developed, nor does it show that he directly participated in the scheme.  Kimoto was incarcerated on April 18, 2008, whereas work on the Acai Berry scheme did not begin until February 2009. Accordingly, Kimoto cannot be held liable for either injunctive relief or restitution with respect to the Acai Total

Burn scheme.  We vacate that part of the district court's grant of summary judgment and permanent injunction based on Vertek's violations of the FTC Act in connection with the Acai Total Burn scheme.

## II.  Liability Under the EFTA

Although Kimoto does not contest that Vertek violated the EFTA, he argues that there is no individual liability for corporate violations of that Act.  We disagree.  The EFTA provides that "a violation of any requirement imposed under [the EFTA] shall be deemed a violation [of the FTC Act]." 15 U.S.C. § 1693o(c).  The EFTA further provides that "[a]ll of the functions and powers of the Federal Trade Commission under the Federal Trade Commission Act are available to the Federal Trade Commission to enforce compliance by any person subject to the jurisdiction of the Federal Trade Commission with the requirements imposed under this subchapter."  *Id.*  The EFTA provides no enforcement mechanism of its own, instead relying on the enforcement provisions in the authorizing statutes of the agencies tasked with enforcing the FTC Act.  *See* 15 U.S.C. §§ 1693o(b)–(c). As previously discussed, where the FTC seeks a permanent injunction for violations of the FTC Act under 15 U.S.C. § 53(b) it can, under appropriate circumstances, hold an individual personally liable for corporate violations of the FTC Act.  *Affordable Media*, 179 F.3d at 1234.  In light of the above, we hold that individual liability for corporate malfeasance is available for violations of the EFTA because such violations are also deemed to be violations of the FTC Act, and that Kimoto is liable for Vertek's violations of the EFTA because of his personal involvement in concocting and carrying out the several schemes that violated the EFTA, which are more fully discussed above.

## III.     Scope of the Injunction

Kimoto next challenges the scope of the district court's injunction on several grounds.  First, he contends that the injunction is not tailored to his specific bad acts.  Second, he argues that the injunction's ban on certain types of marketing and advertising, and on all use of testimonials, is impermissibly broad.  Finally, Kimoto argues that the injunction's ban on all electronic fund transfers is overbroad.  None of these arguments is availing.

To determine if an injunction is overbroad, we consider "(1) the seriousness and deliberateness of the violation; (2) [the] ease with which the violative claim may be transferred to other products; and (3) whether the respondent has a history of prior violations." *FTC v. John Beck Amazing Profits*, *LLC*, 888 F. Supp. 2d 1006, 1012 (C.D. Cal. 2012) (citing *In re Stouffer Foods Corp.*, 118 F.T.C. 746, 811 (1994)).  The Commission "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past." *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952).  And those "caught violating" the FTC Act "must expect some fencing in." *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 431 (1957).  Accordingly, injunctive relief under the FTC Act may be framed "broadly enough to prevent respondents from engaging in similarly illegal practices in future advertisements." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965).  The injunction will be upheld so long as it bears a "reasonable relation to the unlawful practices found to exist." *Id.* at 394–95.

Vertek operated as a common enterprise with other companies involved in the scheme.  Where corporate entities operate together as a common enterprise, each may be held

liable for the deceptive acts and practices of the others. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010). Kimoto, in turn, is personally liable for Vertek's violations of the FTC Act in connection with each of the schemes previously discussed, except for the Acai Total Burn scheme, by virtue of his having personally participated in each of the deceptive schemes, and by virtue of his control over Vertek prior to his incarceration. Kimoto has also consistently engaged in variations on the same deceptive marketing scheme, which, in its latest iteration alone, has defrauded consumers of more than $29 million. As the record reveals, the common elements employed in each of the frauds concocted by Kimoto is easily transferable both to new product lines and to new modes of communication with consumers. Accordingly, because the district court's injunction was based on Vertek's violations of the FTC Act in connection with the Line of Credit, Grant Connect, and Work From Home schemes, it is not overbroad but is, instead, reasonably tailored to "prevent respondent[] from engaging in similarly illegal practices in future advertisements." *Colgate-Palmolive Co.*, 380 U.S. at 395.

## CONCLUSION

For the reasons above we AFFIRM the district court's grant of summary judgment to the FTC in part, and VACATE the district court's grant of summary judgment to the FTC with respect to the Acai Total Burn scheme. We REMAND to the district court so that it may modify the permanent injunction and the amount of restitution as required by this opinion. Each party shall bear its own costs.

**AFFIRMED in part, VACATED in part, and REMANDED for further proceedings.**